JOHN R. TRACY, Appellee, v. LIBERTY OIL COMPANY, Appellant.

No. 39611.

June 24, 1929.

J. A. Dyer and Kelleher & Mitchell, for appellant.

Mitchell & Mitchell and Price & Burnquist, for appellee.

De Graff, J.—I. Plaintiff is a farmer and hog raiser in Webster County, Iowa. The defendant (appellant), Liberty Oil Company, is a corporation, with its principal place of business in Des Moines, Iowa, and is engaged in the manufacturing and distributing of a stock food known as "Life Guard Mineral." In October, 1925, W. D. Rudkin was agent and district manager of said company in certain territory, including Webster County, Iowa. One John Dunn was a local agent of the company, residing near Clare, Webster County, Iowa. Rudkin was named as a codefendant, but the trial court, upon the conclusion of all the evidence, directed a verdict in his favor. As to this defendant, the cause of action, therefore, has reached a terminal point. On the 4th day of October, 1925, about 153 of plaintiff's hogs showed some symptoms of sickness, whereupon plaintiff called a veterinarian, who prescribed that the hogs be "taken off feed" for a few days. Two days later, Rudkin called at plaintiff's farm, and

induced the plaintiff, as alleged, to feed, and allow Rudkin to feed, the hogs a quantity of "Life Guard Mineral" supplied by the appellant. Part of this "mineral" plaintiff had purchased through the local agent, Dunn, or the agent Rudkin, and a part had been purchased through the same agency in conjunction with his brother-in-law. It is the claim of the plaintiff that all of the hogs which were fed the "Mineral" died within a few days.

Although there are divers points or propositions presented by appellant on this appeal, there is one of signal significance, which has to do with the motion of the defendant Liberty Oil  Company for change of place of trial, on the theory that the Liberty Oil Company was suable in Polk County, the place of its residence. This motion was overruled by the trial court. Did the trial court rule correctly? This is a personal action, and except as otherwise provided, must be brought in a county in which "some of the defendants actually reside." Section 11049, Code of 1924. The one statutory exception to which attention must be directed is Section 11046, Code of 1924. This section reads:

"When a corporation * * * has an office or agency in any county for the transaction of business, any actions growing out of or connected with the business of that office or agency may be brought in the county where such office or agency is located."

This has been the statute law of Iowa since the Revision of 1860 (Section 2801), with the exception that the word "actions" in the present section previously read "suits." In brief, this section has reference to the commencement of an action under the conditions named therein.

It is further insisted by appellant that Section 11079, Code of 1924, precludes a recovery in this case, because the defendant Rudkin was not served in Webster County. In the instant case,  however, we are not concerned with the matter of service, for the reason that both defendants (principal and agent) appeared generally, filed answers, and submitted to trial. Any question, therefore, as to how or where the defendants were served, or if served at all, is wholly immaterial. The record discloses that affidavits were attached by the defendant Liberty Oil Company to its motion for a change of venue. The primary ground of the

motion was that the business giving rise to this action did not grow out of the agency of Rudkin, for the reason that, at the time of the commencement of this suit, he (Rudkin) was not an agent of said defendant company in Webster County, and that Webster County had not been in his territory since October 28, 1926. This particular recital in said affidavit is not controverted by the appellee; but a careful reading of the said affidavits fail to disclose any denial that John Dunn, residing at Clare, in Webster County, was the agent of appellant at the time of the commencement of this action. In brief, there is no denial in the affidavits of the existence of an agency in Webster County, but only a denial that Rudkin was an agent of the company in Webster County when the action was commenced.

Original notice was served on the Liberty Oil Company in Polk County, Iowa, on April 25, 1927, and return of service was filed in the office of the clerk of the court of Webster County, Iowa. It is further shown that Rudkin was served with an original notice of this suit at Scranton, Greene County, Iowa, in April, 1927, but that at said time he was no longer the agent of the defendant Liberty Oil Company in Webster County. As hereinbefore stated, we are not primarily concerned with the service on the parties; nor need we determine whether an action may be maintained in the county where there was an agency out of which the transaction arose, which agency had been terminated at the time of the commencement of this action. The simple question is, Did appellant, by his affidavits attached to his motion for change of venue, establish the fact that no agency existed? The case of *Ockerson v. Burnham & Co.*, 63 Iowa 570, is controlling. In that case, an agent sought to recover damages from his principal for a violation of a written contract. It was admitted by the defendant that the plaintiff had been the agent of the defendants at Red Oak, Montgomery County, Iowa, and that the agent was conducting the business of the defendant: to wit, the disposition of flaxseed in Montgomery County. Plaintiff sought to recover his commission of eight cents per bushel. It was ruled that the defendant might be held in the county where the agency was maintained, but this ruling had no relation to the fact that such agency had been terminated. The *Ockerson* case, supra, presented two questions: (1) Had defendants an agency in Montgomery County at the time the suit was commenced? (2)

Did the action grow out of or was it connected with the agency? Both questions, under the record in that case (which we have taken the pains to examine), must be answered in the affirmative. These questions were so answered in the opinion of this court. The record discloses an admission on the part of Burnham & Company, the defendant, that, at the time of the commencement of the action, they had an agent in Montgomery County, and that this agent was the successor of the plaintiff Ockerson, who was the former agent in said county. The record fails to show upon whom service of suit was made, but it is clear that the defendant had an agency at said time in said county. Sufficient to state that Montgomery County was the proper venue.

If there is an agency in a county for the transaction of the principal's business, it is not necessary that the agency have a permanent office or a "room" in which he offices. *Lake v. Western Silo Co.*, 177 Iowa 735; *Kabrick v. Case Thresh. Mach. Co.*, 180 Iowa 598. When the instant defendant entered its appearance in Webster County and filed its motion for a change of venue, that act must be viewed as a voluntary appearance; and it may be observed that the motion as filed cannot be viewed as a special appearance in any sense, as defined by statute. Section 11088, Code of 1924. The motion of transfer invoked the jurisdiction of the court to act thereon. If the ground of the motion was not good, then clearly the defendant was in Webster County court for every purpose. We hold, as did the trial court, that the motion was not good, and that, therefore, the trial court had jurisdiction of both the subject-matter and the person.

II. Appellant contends that there is no evidence of the market value of plaintiff's hogs in the condition they were in on October 6th, and that the evidence as to the market value of well hogs is not the probative measure of value in this case. The trial court, in the instruction given to the jury in relation to the quantum of plaintiff's recovery, stated that the measure of damage is "the fair, reasonable market value in the vicinity of Barnum, Iowa, October 6, 1925, immediately after the plaintiff fed the Life Guard Mineral to the hogs that died, the death of which you find was directly and proximately caused by the feeding of Life Guard Mineral, taking into consideration the condition that said hogs were in at that specific time." We discover no basis for

criticism of the quoted instruction. The question and the challenge are directed to the fact that the evidence of the value of these hogs has reference to sound, healthy, marketable hogs, and further, that at least two days prior to the administration of the Life Guard Mineral, a large number of these hogs were sick. The undisputed evidence shows that, prior to the feeding of the Life Guard Mineral to plaintiff's hogs, a large number of them were sick, and received the attention of a veterinarian.

When we turn to the record bearing on the challenged evidence and the character of the questions upon value, what do we find? The value witnesses were asked concerning the fair market value of a certain number of shoats, a certain number of 80-pound pigs, a certain number of 14-month-old shoats, weighing about 250 pounds each, six brood sows, a certain number of 250-pound sows, and two sows each of which was mothering a brood of pigs. The question asked of plaintiff, as a witness, as to these various groups was: "What do you say was the fair market value [of each group] about October 6th?" The objection made to each of these questions bearing on the value of the pigs and hogs in question reads as follows:

"Objected to unless the answer is to be with reference to the market value of the hogs in the condition and situation as described by the witness; and further objecting unless it be shown that the witness knows the market value of hogs which had been running on corn, hogging down corn, and the number of which had been ill a day or two previous to October 6th."

This objection was overruled, and an exception noted. The other witness on value, Mr. A. A. Frank, was asked, in substance, the same questions as to the various groups as classified by counsel for plaintiff in his questions put to the plaintiff. An objection was entered that the questions called for incompetent and immaterial evidence, unless the said questions refer to the market price of the hogs in the condition and situation in which Tracy's hogs were on the date of October 6, 1925. This objection was overruled. The witness Frank testified:

"I am testifying about the condition of hogs to be put on the market. I have no personal knowledge of the condition of Tracy's hogs on October 6th."

On cross-examination, this witness stated that he did not know whether or not the hogs on Tracy's place were well hogs and ready to be marketed on that day.

"Q. The prices and values about which you have testified have regard solely to unquestionably well hogs, isn't that true? A. Yes, sir, it is."

He further said that he would not put a price on the hogs if they were sick, and that he did not know "that there is such a thing as a market price for hogs that were sick." This court has recently defined the term "market value," wherein it is said:

"The market value of an article of trade is the price at which it can be bought and sold in the ordinary course of trade." *Smith v. Louisville & Nashville R. Co.*, 202 Iowa 292.

From this brief analysis of the record evidence bearing on the value of these hogs, clearly there was no basis for the jury to render a verdict in conformity to the instruction given by the court. This matter was first raised by the defendant in its motion for a directed verdict in its favor, upon the conclusion of plaintiff's testimony, and was again specifically urged by defendant in its motion for a new trial. We are constrained to hold that the trial court was in error in its rulings on the admission of this evidence, and in overruling defendant's motion for a new trial on this ground of the motion.

III. Evidence was offered by the defendant to prove the wholesomeness and non-deleterious character of the Life Guard Mineral, in response to the claim and the evidence offered by  plaintiff that said Mineral was unwholesome and injurious in character. The trial court sustained objections to the proffered testimony of defendant, which objections offered by plaintiff were that the testimony was "incompetent, irrelevant, and immaterial, calling for matters collateral to the inquiry in issue, and there is no showing that the Life Guard Mineral fed on his [plaintiff's] farm was the same Mineral alleged to have been fed to these [other] hogs, or that the [other] hogs were in the same condition." It will be remembered that the Life Guard Mineral was manufactured from a formula which prescribed the ingredients to be used in the manufacture of the Mineral. The

formula was offered in the testimony of a Mr. Burke, of Ames; and when the president and general manager, Barrowman, of the defendant Oil Company was called as a witness for the defendant, he testified that Burke's statement is substantially correct as to the contents and percentages. This statement was followed by an explanation of how the company manufactured the Mineral and placed it on the market for sale and distribution. Following this line of testimony, Barrowman was asked, on his direct examination, relative to the quantity of the Mineral that his company had manufactured, sold, and delivered. An objection was made by plaintiff to this line of testimony, on the ground that there was no proper foundation laid for its introduction. This objection was sustained. Thereupon, the witness was asked as to the territory served, and whether or not, during the 6 years that the company had been manufacturing and selling the mineral, it had ever caused the death of any hogs, and whether or not, when the Mineral "leaves its factory, it leaves with the ingredients named in the formula, and with nothing else in it." Objections were sustained to all of this line of testimony. The defendant then made proffer of the testimony which had been excluded on objections, to which the court also sustained objections of a similar type.

We discover no reason why the defendant was not legally privileged to prove what he attempted to prove, in answer to the allegations and claims of the plaintiff. Plaintiff fixed the trial theory, and the plaintiff should not be permitted to deny the right of the defendant to offer counter proof on a like theory. The character, quality, and effects of the mineral were in issue, and there is no reason to close the door to the defendant when it attempted to meet the testimony of the plaintiff in this particular. The major part of the testimony sought to be introduced by the defendant in this regard should have been admitted.

IV. The claim is made by the defendant that plaintiff has failed to prove that the Mineral administered to these hogs was the proximate cause of the death of the hogs. This goes to the  sufficiency of the evidence to sustain the verdict. The question is, in brief: What did cause the death of these hogs, and has the plaintiff established by a preponderance of the evidence the cause of the death?

Both plaintiff and defendant had an analysis made, both quantitative and qualitative, of the Mineral, and there is no material dispute as to the result of these analyses. Dr. Ludgate, the veterinarian who first saw these hogs prior to the feeding of the Mineral, concluded from his diagnosis that the 25 or 30 hogs then sick had a "touch of the flu." Upon cross-examination in this case, he declined to state whether, when he "posted" some of these hogs, he found a single constituent element of the Mineral in the alimentary tract of the hogs posted. True, he testified that the black, gritty, sand-like substance "might have been in the alimentary tract," and in his opinion, the substance found in the alimentary canal was charcoal (one of the ingredients of the Mineral).

Another expert, Dr. Smith, did not testify as to what this "black substance" was, when he posted several of the dead hogs. It was, in his opinion, simply "similar in appearance to charcoal." He was asked, "Did you find any bone charcoal in the intestinal tract of those hogs?" He answered that he made no chemical examination.

"Q. Now, doctor, isn't that a very simple question? Can't you answer yes or no? A. I am not a chemist. Q. What is the effect of administering Life Guard Mineral,—assuming that the analysis lying in front of you is substantially correct,—what would be the effect upon the hogs? A. It depends upon the size of the pig, how much of it was fed, and how it was fed, and the condition of the pig. Q. Now what effect would it have upon the pig? Would it be a laxative or otherwise? A. It might be both."

This expert further testified that the first pig he posted on October 9th "weighed approximately 90 pounds, had a temperature of 105.5, was thumping, coughed, and squealed, jumped and vomited, showed muscular tremors, unable to stand or walk. The symptoms of the pig posted on the 9th showed symptoms of poison. It vomited. The one brought to me on the 16th was constipated. I observed the symptoms of it the day it was brought in. I remember the first pig I posted. It trembled like a dog that had taken strychnine poison. I was informed, when this pig was brought in, that the other pigs acted pretty much the same way. I was informed, on the morning of the 9th, that

about 25 were dead, and that they were all sick, or most of them were sick. Q. In your experience as a veterinarian, can you tell us what there is in Life Guard Mineral that would produce the death of these hogs? A. That is a hypothetical question.'' (*Mirabile dictu.*)

If these experts could not determine that the Mineral administered to the hogs in the instant case did not cause the death or contribute to the cause of death, how could the jury answer this question? There was no evidence that any of the ingredients of the Mineral were *per se* dangerous or deleterious, or that its administration was the proximate cause of the death of the hogs. The veterinarians spoke of gastritis, enteritis, hemorrhagic septicæmia, as a probable cause of the death of the hogs in question.

It is the well settled rule that a theory may not be said to be established by circumstantial evidence unless the facts upon which the theory is predicated are of such a nature and so related to each other that the conclusion sought to be drawn therefrom is the only conclusion that fairly and reasonably arises. If it may be concluded from the circumstances surrounding the case that they indicate simply a possibility that the theory of plaintiff is true, then plaintiff has not made out his case. *Hemminger v. City of Des Moines,* 199 Iowa 1302, l. c. 1307, with cases cited.

In the case at bar, the essential facts upon which proximate cause may be based are essentially within the domain of expert testimony, and, as said in *Ramberg v. Morgan* (December 13, 1929), —— Iowa —— (218 N. W. 492) :

''But, if plaintiff's own medical experts are in doubt, and could not, on the hypothetical question put to them, state with any reasonable certainty that the death of the decedent was aggravated or accelerated by the negligence of the defendant, how could a court or jury determine such proposition? It is obvious, under such circumstances, that the jury could do no more than guess or conjecture as to whether the death of plaintiff's intestate resulted from the original injury or from the defendant's lack of skillful treatment or the absence of all treatment.''

The burden was upon the plaintiff to show a causal connection between the act charged and the resulting death of the hogs. The evidence must justify an inference from the act charged,

rather than from some other cause. We ask again, How could a jury of laymen make a finding on a question that plaintiff's own experts could not, with any certainty, answer? For the reasons pointed out herein, the judgment entered must be, and is,—*Reversed.*

All the justices concur.