JOHN W. JENSEN, Appellee, v. MOORMAN MANUFACTURING COMPANY, Appellant.

No. 40818.

JANUARY 12, 1932.

Wilson & Schmiedeskamp and Chas. S. White, for appellant.

T. M. Rasmussen and Swan, Martin & Martin, for appellee.

Evans, J.—The ultimate question in this case is whether the evidence introduced on behalf of plaintiff was sufficient to warrant a submission of the case to the jury. On Tuesday, July 23, 1929, the plaintiff bought at the stockyards in Omaha, 293 lambs. They were duly shipped by him to his farm in Audubon County, where they arrived on Wednesday, July 24. Some days prior to that time he had contingently ordered a quantity of stock food manufactured by the defendant and sold in Audubon County by one Williams, as agent for the defendant. The prospective purchase of the lambs was the contingency in the order. On Sunday night, July 28, the plaintiff phoned Williams that he had bought his lambs, and requested delivery of the stock food known as "Grofast". Early Tuesday morning, July 30, Williams delivered 30 pounds of the same and took a written order for more, to be delivered later. This product of the defendant's contained among its ingredients 2.44% of copper sulphate. This product was well known and extensively used in the vicinity of plaintiff. At the time it was brought to the plaintiff, and before any of it was fed to his lambs, eight or ten of his lambs had already died. One-third of the amount brought by Williams was placed by him in a trough which was accessible to the lambs. They ate of it sparingly, and a substantial part of it was still in the trough on Friday morning, August 2. In the meantime, and on Thursday, August 1, the plaintiff called Dr. Fitch, a veterinarian, to examine his lambs. Dr. Fitch on that day made a post-mortem examination on two or three carcasses. This examination disclosed an extreme case of worm affliction, and he advised a process of worming to be taken promptly. He directed that they be shut off from all feed as a preparation for the process, and agreed to be on hand early Saturday morning for the performance of the job. At six o'clock on Saturday morning, August 3, he commenced the job, and finished it by 9 o'clock. Shortly before the completion of the job the sheep thus operated on began to die, and eight or ten

of them died before 9 o'clock, and fifty or sixty of them died later in the day. The theory of the plaintiff upon which he finally tried and submitted his case was that they all died from overdoses of copper sulphate. Though under all the evidence the theory is very doubtful, yet we adopt it for the purpose of this discussion precisely as the plaintiff claims it. The testimony of plaintiff's experts was that fifteen to twenty grains of copper sulphate is the ordinary and safe dosage for a lamb; that more than twenty grains may be tolerated, yet such excess is in the danger zone. The total amount of copper sulphate contained in thirty pounds of Grofast, if divided equally among 290 lambs, would amount to less than nineteen grains for each one. One-third of the amount purchased was placed in the trough by Williams on Tuesday. A substantial part of this was left in the trough unconsumed up to Friday morning, according to plaintiff's evidence as a witness. On that morning he fed the lambs as usual, notwithstanding the direction of Dr. Fitch to the contrary. He also put into the trough one-half of his remaining supply of Grofast. He testified that this was all consumed by the lambs by noon. He thereupon put the remnant of the supply into the trough, and this was all consumed by the lambs before nightfall. At six o'clock the next morning the process of worming began. The plaintiff testified that at that time the sheep were "dopey" and inactive. Many of them would hardly move. He testified:

"The first time that I observed anything in regard to the actions of the sheep that would indicate that they were not in normal condition was Saturday morning."

The process of "worming" consisted of forcing into the stomachs of the lambs by the use of a tube, a solution of copper sulphate. The quantity of copper sulphate in each dose was fifteen grains. The contention of plaintiff is that he was misled to disregard the direction of the veterinary Dr. Fitch by the advice of Williams, and that the overdosage thereby resulted. He amended his petition to that effect. In his brief filed here, he frankly concedes that the product Grofast is harmless and beneficial under ordinary conditions. The following quotation from his brief will indicate his contention at this point better than we can state it:

"The basis of the claim of the appellee against the appellant in this case is *not* that the minerals manufactured by the appellant are injurious when fed in proper quantities or under ordinary conditions, and appellee admits that they are a meritorious product; but appellee's case is founded on the negligence of the appellant's agent in instructing appellee to keep these minerals, which contain copper sulphate, before the lambs *just prior to the worming,* when they were off feed and *about to receive a medicinal dose of copper sulphate,* used in accordance with the ordinary worming practice. The appellee claims that such instructions by the agent resulted in the lambs in question obtaining an *overdose of copper sulphate,* which caused the death of many of them and the loss complained of."

The plaintiff put in evidence the expert opinion of Dr. Fitch, as follows:

"It is my opinion and my experience in use of drugs of different kinds, and in my experience and use of copper sulphate, and my judgment of the condition—the anemic condition—these animals were in on Thursday, when the post mortem was held first, the natural weakened condition they would be in, due to parasites in combination with the effect of consuming these ingredients, and in addition to that the fifteen grains that were administered by me, it is my opinion—what might have been the cause of death would have been from the effects—the poisonous effects—of this mineral used, *and the copper sulphate administered by me,* in conjunction with the weakened condition that the animal was in at the time it was treated."

It will be noted from the foregoing that it was the combination of the dosage of Friday and Saturday that is relied on by plaintiff as the cause of his loss. The dosage of Friday was the affirmative act of the plaintiff himself. The dosage of Saturday was the act of his own agent, participated in by the plaintiff himself. He would exculpate himself from blame by placing the blame upon Williams, and we turn to the record to ascertain what Williams did. The plaintiff testified to a conversation which he had with Williams on the road on Tuesday, July 30. It was on the morning of this day that the Grofast had been delivered to him. We quote:

"I asked Mr. Williams on the road to the rendering plant, we were talking about worming them, and I priced his stuff, and he told me the price of it. I says, 'In case *we take a notion* to worm these lambs, shall I feed those minerals before we worm them?' and he said, 'By all means, it would get them in much better condition to worm.'"

Plaintiff also testified that Williams "admitted he didn't know much about sheep. I thought they might have worms and it might pay to worm them just as Mr. Williams told me, so I decided to find out, and called Dr. Fitch to come down and post one. Dr. Fitch came down Thursday afternoon and posted one of the lambs." The state of the evidence at this point was briefly stated by the district court in Instructions 23 and 24, which will be later set forth herein.

It will be noted that the alleged conversation with Williams was no part of the inducement of the contract of purchase. Williams did not profess to any expert knowledge on the subject, but "admitted" that he knew little about it. The conversation was had two days before Dr. Fitch was called in. The advice of Dr. Fitch was definite as to the course to be followed. The plaintiff neither advised Dr. Fitch of what Williams had said nor later advised Williams of what Dr. Fitch had said. Dr. Fitch did not know that Grofast was being fed, and Williams did not know what process of worming was to be followed. It is conceded in the record that lambs will not ordinarily eat sufficient Grofast at a time to exceed a safe dosage. The process of worming adopted by Dr. Fitch was that of forcing into the stomach of a sheep by means of a tube, a solution of copper sulphate. The dosage of each sheep contained fifteen grains of the drug. The copper sulphate in solution operated more rapidly than if it had been administered dry and contained in a capsule. The process adopted by Dr. Fitch was in accord with good veterinary practice, but it was not exclusive, as such. Dr. Getz, testifying for plaintiff, stated that he had never himself used such process, but that he had administered copper sulphate in capsules. The fatal act involved here was the *enforced* dosage of fifteen grains in solution on Saturday while the lambs were still under the influence of the dosage of Friday. They would not of their own accord have taken the dosage of Saturday. When the plaintiff determined to have the worming done on

Saturday, he should have withheld the dosage of Friday. Having fed them the dosage of Friday, he should at least have informed Dr. Fitch of the fact. This would have resulted in a postponement of the worming process. It is urged in argument that he did not know that the dosage would be cumulative. But he had the clear opportunity to know from his veterinarian. Moreover he did know from Dr. Fitch that he should cut off all feed from his sheep in preparation for the final process. Dr. Fitch ascribed the condition of the lambs to the diagnosis made by him on Thursday. He knew nothing about the events of Friday. If Williams was negligent in giving the advice, was plaintiff any less negligent in following it against the advice of his veterinarian? The ingredients of this product were not a secret formula. Every ingredient in it was either known or ascertainable. The evidence discloses no claim of want of knowledge in that respect. It is undisputed upon this record that, if Dr. Fitch had known what the plaintiff had done on Friday, he would not have wormed the lambs on Saturday. Only the plaintiff had an opportunity to inform him. Williams was not advised of the worming operation. It was done without his knowledge. True, it was none of his business, unless he was responsible for the alleged advice.

To advise that the voluntary eating of the product by the lambs would be beneficial, is not the equivalent of saying that such voluntary taking might be safely *followed* by a forced administering of another dose of the same ingredient.

II. We turn now to Instruction 23, which was as follows:

"No. 23. It appears from the evidence without substantial conflict that about August 1st, 1929, the plaintiff called to his premises Dr. Fitch, a veterinarian located at Audubon, Iowa, for the purpose of making an examination of said lambs; that at said time said veterinarian advised the plaintiff that it would be necessary that said lambs be wormed, and instructed plaintiff to prepare said lambs for worming on August 3rd, to take them off feed and keep them in a dry lot, and allow them to have nothing but water after the evening of August 1, 1929.

"You are instructed that in such case the said Dr. Fitch, the veterinarian, was acting for and in behalf of the plaintiff, and was his agent, and any negligence upon his part would be the negligence of the plaintiff.

"If you find from the evidence that thereafter plaintiff knowingly permitted said lambs to receive foods or remedies other than those prescribed by said veterinarian, and that said act, if shown, contributed to the loss or damage to said lambs in any degree, then plaintiff cannot recover in this action, and your verdict should be for the defendant."

It is the contention of the appellant that the verdict rendered by the jury was in disregard of the directions of this instruction. We think the point well taken. In support of the verdict, it is urged by appellee that the plaintiff did not *knowingly* violate the instructions of the veterinarian. But he did violate them, and he did know that he violated them. Such was his own testimony, in legal effect.

The appellant also complains that the verdict ignored Instruction 24, which was as follows:

"No. 24. You are further instructed that if you find from the evidence that Dr. Fitch, veterinarian, while in the employ of the plaintiff, examined said lambs on August 1, 1929, and pronounced them healthful, and if you further find that he returned August 3, 1929, and began to worm said lambs, and at the said time found said lambs, or a majority thereof, in a dull, dopey and listless condition, and you further find from the evidence that it would not be good practice among veterinarians to proceed with the worming of said lambs under said conditions, and that in the exercise of reasonable care and caution, said worming should not have continued until a further examination had been made of said lambs and the cause of their then condition, and if you further find that if said worming, carried on under such conditions then known to such veterinarian, contributed in any degree to the damage or injury complained of, then and in that event such acts on the part of said veterinary, if shown, would be sufficient to warrant you in finding that Dr. Fitch was negligent, and the plaintiff cannot recover, and your verdict should be for the defendant."

We think this point is likewise well taken. The plaintiff's own experts testified that the condition of the lambs on Saturday morning, as described by the plaintiff, and as observed by Dr. Fitch, was such as to call for further diagnosis before proceeding to the worming process. Dr. Fitch was misled because he relied

upon the diagnosis of Thursday. Dr. Fitch attributed their then condition to the very progress of the disease discovered on Thursday. To support the present theory of liability advanced by the plaintiff, the condition of the lambs on Saturday must be attributed to the fact that they had eaten copper sulphate to the full limit of their capacity on Friday. Such was the assumption of plaintiff, as a witness. He was the only person who knew the quantity of Grofast that they had eaten on Friday. He misled his own doctor, and thereby prevented the very diagnosis that would have saved his lambs.

At this point it is to be observed also that there was no necessary contradiction between the advice of Williams on Tuesday and the direction given by Dr. Fitch on Thursday. When Williams gave his advice on Tuesday, the question of worming was a mere future contingency. The feeding of "Grofast" had already begun. This continued for three days before the diagnosis made by Dr. Fitch. The direction of Dr. Fitch gave an opportunity for twenty-four hours of starvation to precede the worming process. In this connection a significant circumstance appears. At the post mortems made by Dr. Fitch on Thursday, an extraordinary condition as to the presence of worms was revealed. Dr. Fitch testified "The large intestines contained, I believe, the most tape worms I ever saw in a sheep." On the other hand, the post mortems made on Saturday disclosed no worms. This circumstance tended to show that the preceding use of Grofast had finally accomplished the very purpose which was intended by the worming process on Saturday. It is shown that such process would necessarily weaken and sicken the sheep temporarily. The worming process followed on Saturday became thereby not only unnecessary, but also highly injurious. Up to Saturday morning, therefore, Grofast had performed its promised function. Indeed, upon this record, this product is not under fire. Its merit and efficacy are frankly conceded. Under plaintiff's own testimony, the damage is traceable to the plaintiff's own blunder of Friday or Saturday, or both.

Whether in any event the mere advice of a professedly non-expert as to a curative method may be considered as actionable negligence, we do not consider. No affirmative implication to that effect should be drawn from our discussion.

Looking, therefore, alone to the evidence on behalf of plain-

930

tiff, as it appears in this record, we are of opinion that the defendant's motion for a directed verdict at the close of all the evidence should have been sustained; that Instruction No. 23 (and perhaps No. 24) was in legal effect the equivalent of an order for a directed verdict, in that obedience to such instruction would have resulted necessarily in a verdict for the defendant.

The judgment below is accordingly—Reversed.

WAGNER, C. J., and ALBERT, KINDIG, DE GRAFF, MORLING, FAVILLE, and GRIMM, JJ., concur.