F. S. MILLER, Appellee, v. ECONOMY HOG & CATTLE POWDER COMPANY, Appellant.

No. 45014.

June 18, 1940.

C. R. Barnes and M. C. Hamiel, for appellant.

Fisher & Fisher, for appellee.

OLIVER, J.—Action at law to recover for the death of sheep alleged to have resulted from the feeding of stock powder compounded and sold by defendant to plaintiff. The petition alleged, breach of warranty and negligent representations. The answer was a general denial coupled with a plea of contributory negligence. Trial to a jury resulted in a verdict and judgment against defendant for $1,600 and defendant has appealed.

Defendant-appellant, Economy Hog & Cattle Powder Company, an Iowa corporation with its principal place of business in Page county, was engaged in the manufacture and sale of livestock conditioning powders, remedies, etc., compounded under its formulae and sold under its trade names. One C. C. Kenworthy had been sales manager for appellant for a number of years. Plaintiff-appellee, F. S. Miller, was a farmer and stock feeder near the town of Clarence, Cedar county, Iowa. Paul Pruess, a farmer and feeder of Cedar county, had for several years taken orders for appellant's products in Cedar county, and adjacent territory. Appellant paid Pruess a commission upon his sales. The orders taken by him were filled by shipments direct from appellant to the purchasers and occasionally by shipments to Pruess, but he does not appear to have stocked appellant's products for sales on his own account.

In August 1936, appellee shipped from South Dakota about 2,800 lambs or sheep. These were pastured until about October 1st, when appellee moved them to his home farm and gradually increased their feed. Appellee testified the sheep were in average condition; that a few of them died each month prior to December, and about 15 between December 1st and December 26th. He had previous experience in feeding sheep from this territory and thought the losses in December were somewhat more than normal. About December 9th, appellee called Dr. Wilson, a veterinarian, who testified he found about

a dozen of the sheep sick and two dead. He examined the sheep and performed post-mortem examinations on dead animals. Dr. Wilson found the ailment was gastritis, an inflammation of the lining of the stomach or digestive tract. He described this condition as slight or relatively mild. He found no infectious disease. In his opinion the gastritis was caused by too much concentrated food, the food was too rich in protein. The protein came principally from oil meal, cottonseed meal and bean meal. Dr. Wilson advised appellee to stop or reduce the protein feed and appellee testified that food was substantially reduced.

About December 19th, Dr. Paul examined the sheep and he also testified to a mild gastritis. At this time there were other post-mortem examinations and Dr. Wilson, Dr. Paul and Dr. Fenton made laboratory tests, which showed no infectious or congestive disease.

Mr. Pruess and Mr. Kenworthy had at times traveled together soliciting sales for Economy products in Cedar county. In the fall of 1936, they twice called upon appellee. Appellee testified Kenworthy then told him the powders would do the sheep good and would not harm them, and advised him to get in touch with Pruess any time he decided to buy any goods of the Economy Hog & Cattle Powder Company.

On or about December 26th, appellee, by appointment, met Pruess in Clarence. Appellee's story was that he told Pruess he had been losing too many sheep and that the veterinarian had told him it was protein poisoning and had advised him to take them off of feed; that Pruess was asked if he thought it would be advisable to give them the powders, and that Pruess said he thought it would be alright but suggested that Kenworthy be contacted so as to get the thing straight. Pruess telephoned Kenworthy who talked to appellee. Appellee testified he repeated to Kenworthy the information he had given Pruess about the sheep and the veterinarian's statements and asked Kenworthy if it would be alright to feed the stock powder to the sheep and that Kenworthy said it would be alright and that appellee should get it from Pruess' farm. (Upon each sack of Economy Stock Powder was a likeness of

a hog and appellee frequently referred to it as hog powder.) Appellee said Kenworthy told him to feed the stock powder and that he would ship appellee 500 pounds of Economy Sheep Powder to follow up with. He instructed appellee how much powder to feed for each lamb—to mix the powder with oats— to take the lambs off feed at least 24 hours until they were hungry and would be forced to eat. Appellee testified that in feeding the powder to his sheep he relied upon the statements made by Kenworthy.

Apparently appellee understood he was to buy stock powder from Pruess and Kenworthy understood appellee would borrow it pending receipt of shipment from the company. To avoid a trip to the Pruess farm for stock powder appellee suggested to Pruess that he could temporarily borrow one 100-pound sack from one Bixler. This was done. Pruess had advised appellee that there was a freight shipment from appellant enroute by railroad out of which appellee's needs could be supplied. This shipment consisted of sixteen 100-pound sacks consigned to Pruess in part for his own use and in part for other parties. It arrived at Clarence later that day (Saturday).

The following Monday morning appellee called at the car, secured three sacks of the powder from Pruess and paid for them. Appellee testified the sheep had been kept without food on Saturday; that Sunday they were fed the one sack of the powder secured from Bixler, mixed with oats as directed by Kenworthy; that a second feeding of the powder mixed with oats was made Monday; that Tuesday nearly 350 of the sheep were dead or dying, and that no more stock powder was fed. Appellee claimed 435 sheep died within a few days, but that after the end of that time only a few sheep died during a period of several months.

■ ■ ▪ I. Prior to the time answer was filed the court overruled appellant's motion for change of venue from Cedar county to Page county. This ruling is assigned as error. The motion and the resistance thereto were supported by affidavits. Reference has already been made to most of the material matters sought to be proven by said affidavits. Appellee based

his right to maintain the action in Cedar county upon the following Code section:

"11046 Office or agency. When a corporation, company, or individual has an office or agency in any county for the transaction of business, any actions growing out of or connected with the business of that office or agency may be brought in the county where such office or agency is located."

The two elements essential to venue in Cedar county were: (1) Agency of Pruess for the transaction of business for appellant in Cedar county, and (2) that the transactions in question grew out of or were connected with such agency.

The record contains evidence of a regular course of dealings in which Pruess, a resident of Cedar county, had for some years solicited orders for appellant in that county and vicinity, working individually and with Sales Manager Kenworthy; that he collected accounts for appellant and that occasionally orders sold by him to others were shipped to him. The transaction here in controversy was initiated through Pruess representing appellant. Pruess assisted in the negotiations and in the completion of the sale.

It is quite evident that Pruess was agent for the transaction of the business of appellant in Cedar county and that this action grew out of the business of that agency. Therefore, the motion for change of venue was properly overruled. Kabrick v. J. I. Case Thresh. Mach. Co., 180 Iowa 598, 163 N. W. 368; Lake v. Western Silo Co., 177 Iowa 735, 158 N. W. 673; Wood v. Rice, 118 Iowa 104, 91 N. W. 902; Locke v. Chicago Chronicle Co., 107 Iowa 390, 78 N. W. 49; Tracy v. Liberty Oil Co., 208 Iowa 882, 226 N. W. 178.

■ II. The second error assigned is the overruling of the first ground of appellant's motion for directed verdict, which charged that the evidence failed to show it sold any stock powder to appellee or that he fed his sheep any stock powder purchased from appellant. Appellant contends the court should have held as a matter of law that Pruess acted

as an independent dealer rather than as agent for appellant in the sale of the three sacks of stock powder to appellee.

Reference has already been made to the circumstances connected with the transaction, the conversation between Pruess and appellee and the telephone conversation with Kenworthy in which appellee claimed he was told to get the stock powder from Pruess and that the sheep powder would be shipped to him direct. Unquestionably, the arrangement was for the purpose of placing appellant's stock powder in the hands of appellee without delay. By expediting the deal such arrangement would be to the advantage of both appellant and Pruess. Having procured the sale Pruess would be entitled to a commission upon the total amount sold whether shipped direct to the purchaser by the company, or delivered by Pruess. The diversion by Pruess to appellee of part of a shipment originally intended for others would not necessarily constitute Pruess an independent dealer. He may well have done so as agent of appellant. Appellee stated that his conversations with Kenworthy and Pruess led him to believe he was dealing with appellant through Pruess as agent. There was evidence indicating this was the situation or in any event that appellee was justified in so believing. We conclude the trial court properly overruled this ground of appellant's motion for directed verdict.

III. Appellant assigns as error the overruling of the ground of its motion for directed verdict that the evidence was insufficient to prove either warranty or negligence on its part. In this connection appellant contends there was no evidence that Kenworthy knew the condition of the sheep at the time of his telephone conversation with appellee.

It is not necessary that the evidence bearing upon Kenworthy's knowledge of the condition of the sheep be discussed at length. Some of it is technical. The information given him over the long-distance telephone may not have been as detailed as it would have been in a lengthier discussion. However, it cannot be said as a matter of law that it was erroneous or insufficient to apprise Kenworthy of the true condition of

the sheep. We think this question was for the jury. The sufficiency of the instructions upon it is not before us. .

Any affirmation of fact or any promise by the seller relating to the goods is an express warranty, if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. Code section 9941. The statement here allegedly relied upon by appellee was that it would be alright to feed the powder to the sheep in the condition they were in.

Appellant contends this statement was merely an expression of opinion and not a warranty, and relies upon De Zeeuw v. Fox Chemical Co., 189 Iowa 1195, 179 N. W. 605. In that case the statement plead as a warranty was that a worm powder would improve the growth and physical condition of certain hogs, the claimed breach being that the powder contained poison. The court held the statement was not a warranty but merely an expression of opinion similar to that of a physician that a certain prescription would benefit an ill person. It was also held that the alleged poison in the powder was not a breach of the particular warranty plead in that case.

The evidence of warranty in the case at bar was not of a promise to improve the growth or effect a cure but that it would be alright to feed the stock powder to the sheep, in other words that the powder would not harm the sheep. In Powell v. Chittick, 89 Iowa 513, 56 N. W. 652, the representation that certain hogs to be sold were alright was held to be a warranty that they were not diseased. In Conkling v. Standard Oil Co., 138 Iowa 596, 116 N. W. 822, it is stated that a warranty arises when there is a distinct assertion or affirmation of fact—which is relied upon—respecting the quality of the goods or the adaptability thereof to the purpose for which they are desired. That case quotes from 30 Am. & Eng. Encyc. 144, to the effect that the statement that an article is alright or the use of equivalent language, if relied upon by the buyer, amounts to a warranty that it is reasonably fit for the use for which the buyer desires it. See also Swift & Co.

v. Redhead, 147 Iowa 94, 122 N. W. 140; Brennan & Cohen v. Nolan Laundry Co., 209 Iowa 922, 229 N. W. 321. In the case at bar appellee testified he made specific inquiry as to the adaptability of the stock powder as feed for his sheep in their then condition and that Kenworthy stated it would be alright to feed the powders and also instructed appellee how to do so. We think the evidence was sufficient for the jury upon the theory of express warranty. As to the theory of negligent representations or its applicability in this situation, we express no opinion.

The question of implied warranty was also for the jury. Subdivision 1 of Code section 9944 provides:

"1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

Subdivision 4 of said section provides:

"4. In the case of a contract to sell or a sale of a specified article under its patent or other trade name there is no implied warranty as to its fitness for any particular purpose.".

It will. be noted this alleged sale and warranty was by the manufacturer direct to the consumer.

Appellant argues that no warranty can here be implied because the powder was sold under the trade name of "Economy Stock Powder". However, it appears that appellee did not purchase this powder by name, but for a particular purpose made known to appellant and that he relied not upon the trade name but upon appellant's judgment in furnishing the powder for that purpose. Under such circumstances the fact that the powder had a trade name does not exclude an implied warranty. Hughes v. National Equipment Corp., 216 Iowa

1000, 250 N. W. 154; Rowe Mfg. Co. v. Curtis-Straub Co., 223 Iowa 858, 273 N. W. 895.

IV. Appellant contends the evidence was insufficient to show that the stock powder was the proximate cause of the death of plaintiff's sheep. In support of this contention appellant cites Hildebrand & Son v. Black Hawk Oil Co., 205 Iowa 946, 219 N. W. 40. That case involved the death and stunting of hogs after they had been fed a disinfectant and worm expeller. There was no expert testimony, no post-mortem examination of the dead hogs, and no testimony directed to the point that the injury to the herd of hogs was the result of feeding the preparation. The decision holds that proof that animals died or were permanently injured does not alone establish a case. There was no evidence connecting the use of the preparation with the death or injury of the hogs, or showing that such death and injury to the hogs were not the result of disease or other natural causes not chargeable to the preparation.

In the case at bar the sheep were examined on various occasions by veterinarians who also made a number of post-mortem examinations and tests. These examinations and tests disclosed the presence of no congestive or infectious disease or of any ailment except a gastritis. Some of the veterinarians testified the gastritis was mild or slight prior to the feeding of the powders and that two days after such feeding it was greatly aggravated. As previously noted it appears there were no heavy losses of sheep at any time other than during the few days immediately following the feeding of the stock powder. Several veterinarians testified that if no powder had been fed sheep in the condition of these, there would not have been any sudden increase in losses even though the overfeeding of proteins had continued and that without the powder and with the diet less rich in proteins the sheep would shortly have recovered from their condition. Veterinarians also testified the forced feeding method of giving the powder to sheep with a mild form of gastritis would have a bad effect and be danger-

ous because some of the animals would get too much of the mixture. This method was adopted by appellee under instructions from Kenworthy. Several veterinarians testified the stock powder contained various ingredients irritating to the digestive tracts and detrimental and injurious to sheep in the condition these animals were in. A very small amount of some of the substances would irritate the stomach of sheep in such condition. One veterinarian testified that the forced feeding of powder containing these elements would be detrimental to sheep in this condition and likely to cause a considerable number of deaths. Another said that in all probability it would cause deaths and a considerable amount of sickness. Still another said a number of the ingredients would have a deleterious or bad effect and that such feeding would be likely to have the effect of causing death among the sheep. Autopsies and tests performed on December 29th, were said to have eliminated the possibility of the presence of infectious disease. The only condition found was a severe inflammation of the stomach and intestinal tract. It is apparent that in this case there was substantial evidence tending to prove the death of the sheep was chargeable to the feeding of the stock powder and tending to eliminate any other cause. Crouch v. National Livestock Remedy Co., 205 Iowa 51, 217 N. W. 557; Tracy v. Liberty Oil Co., 208 Iowa 882, 226 N. W. 178. Therefore, it was proper to submit this question to the jury.

▆ V. Appellant complains of the refusal of the court to direct a verdict upon the ground of contributory negligence of appellee in failing to tell Kenworthy the condition of his sheep and in failing to follow instructions given him by veterinarians and Kenworthy. The question of Kenworthy's knowledge of the condition of the sheep has already been disposed of. Without attempting to elaborate, it may be said the record shows no failure to follow instructions of veterinarians at the times material to this case. There is also evidence that the stock powders were fed in accordance with the directions given by Kenworthy.

Appellant's particular complaint concerns a certain home-made mixture of salts and earth which was left accessible to the sheep at most times, including the time they were being fed the stock powder. This homemade mixture was not fed the sheep but was left available to them to eat, if they desired. The jury was instructed that if appellee knowingly permitted the sheep to receive foods and remedies other than appellant's stock powder and the same contributed to the loss or damage of the sheep to any degree, appellee could not recover.

The evidence of veterinarians was that this mixture would not, in their opinion, be harmful to any animals that ate it. They testified that the only likelihood of harmful effect would be septicaemia from the dirt and that this was ruled out by the post-mortem tests and findings. Under the record the court did not err in submitting the question of contributory negligence to the jury.

Jensen v. Moorman Mfg. Co., 213 Iowa 922, 239 N. W. 917, is cited by appellant as a contrary holding. That was a suit against a stock food company for the loss of sheep from an overdose of copper sulphate. The owner had fed the sheep the stock food containing copper sulphate. He then engaged a veterinarian to worm them, which was done by forcing a solution of copper sulphate into the stomach of each animal. The result was an overdose. Plaintiff in that case did not inform the veterinarian the sheep had been given the stock food containing the copper sulphate. Furthermore, he continued to feed it contrary to the instructions of the veterinarian that the sheep be given only water the day before they were wormed. Under the factual situation in that case plaintiff was held guilty of contributory negligence. The rule of law there announced is correct but is not applicable to the record in the case at bar.

VI. Instruction No. 4 stated in substance that appellant would be bound by representations of Kenworthy, its general sales agent, made in furtherance of sales, that the stock powder was harmless and not injurious to sheep in the condition of appellee's sheep, provided the jury found Kenworthy

did make such representation to appellee. The instruction correctly states the general rule applicable under this record.

However, appellant contends this was an unusual warranty and as such was beyond the scope of Kenworthy's agency. Appellant's argument upon this proposition is predicated upon the erroneous premise that this was a warranty of cure. The warranty relied upon and referred to in the instruction was that the stock powder would not harm the sheep. Obviously this was not an unusual warranty.

VII. The stock powder and sheep powder shipped appellee by appellant arrived after the wholesale deaths of the sheep and was refused by appellee. Appellant assigns error to the failure of the court to instruct upon this refusal upon the theory that it constituted a rescission of the contract which would relieve appellant from liability upon its warranty. It is sufficient answer to say there was no such issue in the case. Appellee claimed no damage on account of this particular shipment of powder. Nor did appellant raise any issue concerning it.

VIII. The instruction upon damages fixed the measure at (1) the fair market value of such sheep as died at the time of feeding said stock powder to them, plus (2) the prospective and ascertainable loss of future profits upon said sheep so dying.

Appellant contends part 1 of this instruction was erroneous in that it failed to instruct the jury to deduct the value of the remains of the dead sheep. The measure of damages for the destruction of animals is the difference between their value before the occurrence which caused the deaths and the value of the remains. However, the remains of destroyed animals, other than those intentionally slaughtered, frequently have no value or none over and above the trouble and expense entailed in disposing of the same. In such cases the value before death correctly measures the damage resulting from the death. But where there is a showing of value in the remains this should be taken into account and the damages reduced accordingly. The record in this case shows that appellee sold the carcasses

of the dead sheep for approximately $435. From this it affirmatively appears the remains of the dead sheep were of substantial value. Therefore, the instructions should have included this item and its omission was error. See L. R. A. 1918A, note at page 276; 3 C. J. S., Animals, §234.

Appellee does not seriously contend otherwise but asserts appellant was not prejudiced because there was evidence which would have justified a verdict of $2,192 under part 1, whereas the total verdict was only $1,600. The difficulty is that it must be presumed the jury followed the instruction as given and made no allowance for the value of the remains of the dead sheep and that the $1,600 verdict represents the finding of the jury without deduction for such value. Hence, appellant was prejudiced by the omission.

Part 2 of the instruction allowed damages based on ascertainable future profits on the dead animals in addition to their value at the time of death allowed by part 1. This was erroneous. The measure of damages for the wrongful destruction of an animal is its value, less salvage, if any. 3 C. J. S., Animals, §234; 17 C. J., Damages, 185.

The warranty here asserted did not contemplate that the loss of sheep resulting from its breach would render the warrantor liable for future profits as special damages. Future profits were not the immediate fruits of the contract. Under such warranty the measure of damages would be the same as in tort. Presumably payment to the injured party of the value of the animals before death would make him whole. He would not be entitled to future profits in addition to present value.

Appellee refers to language in Swift v. Redhead, 147 Iowa 94, 122 N. W. 140, to the effect that recovery may be had for the loss of profits which might have accrued from feeding stock. That statement had no reference to the question of double damages here involved. The question in that case concerned only loss of profits on live animals as the full measure of damages. Obviously it is not applicable to the situation at bar.

The damage resulting from injury to an animal is the difference in value before and after the injury. There may be other elements of damage such as expense of treatment or temporary loss of use or of produce. But whether an animal is injured or destroyed the total damages ordinarily recoverable may not exceed its value prior thereto. Atlanta Cotton-Seed Oil Mills v. Coffey, 80 Ga. 145, 4 S. E. 759, 12 Am. St. Rep. 244; Georgia R. etc., Co. v. Wallace & Co., 122 Ga. 547, 50 S. E. 478; Gould v. Merrill R. etc., Co., 139 Wis. 433, 121 N. W. 161; Keyes v. Minneapolis & St. L. R. Co., 36 Minn. 290, 30 N. W. 888; Wilson v. Seattle, R. & S. R. Co., 55 Wash. 656, 104 P. 1114; Ellis v. Hilton, 78 Mich. 150, 43 N. W. 1048, 6 L. R. A. 454, 18 Am. St. Rep. 438. This same limitation has been applied in cases involving damage to other kinds of personal property. Langham v. Chicago, R. I. & P. Ry. Co., 201 Iowa 897, 208 N. W. 356.

The case was well tried by both sides and thoroughly presented upon appeal. Some errors were assigned other than those discussed herein. These are either without merit or not likely to arise upon a retrial in which the issues may be simplified.

Because the instruction did not correctly fix the measure of damage the case must be reversed.—Reversed.

HAMILTON, C. J., and SAGER, HALE, STIGER, MILLER, BLISS, and RICHARDS, JJ., concur.