PAUL MARXEN, appellee, v. MATT MEREDITH and DAVE LLOYD dba LLOYD & MEREDITH, and MATT MEREDITH, individually, appellants.

No. 48660.

(Reported in 69 N.W.2d 399)

April 5, 1955.

Rehearing Denied June 10, 1955.

Dalton & Dalton, of Atlantic, for appellants.

Mallonee & Mallonee, of Audubon, and Ray Yarham, of Atlantic, for appellee.

OLIVER, J.—Defendants Lloyd and Meredith operated a retail hardware and farm implement business at Atlantic, Iowa. Plaintiff farmed and raised hogs in that vicinity. June 3, 1949, defendants sold plaintiff a five-gallon can of hog spray. The man who made the spray and sold it to defendants testified for them he secured its ingredients from a gas plant and these were three parts coal tar and two parts drip oil which he mixed and poured into five-gallon cans.

Plaintiff testified defendant Meredith handled the sale of the spray to him. Meredith testified plaintiff told him "he had an awful nice bunch of hogs * * * and before he turned them out on pasture he thought he would spray them." Plaintiff testified Meredith told him they had some good hog spray, "he sold a lot of it and guaranteed it." He did not tell plaintiff the name of the spray, which was on the can. Plaintiff had never seen that kind of spray, did not know what it was and was told nothing about its ingredients. Meredith instructed plaintiff to apply it, full strength, with a sprinkling can, to place the hogs "in a close enough place so they could climb over each other and put it all over them."

Plaintiff testified his hogs were well and in good condition, the pigs were worth $30 per head and the sows $160 per head. He placed about two hundred pigs and twenty sows in a ventilated hog house, and sprayed them with approximately one and one-half gallon of the spray. He then left the hog house to refill the sprinkling can. Five minutes later he returned and found almost all of the pigs lying on their sides, mouths open, kicking and trying to breathe. The sows were not down but were restless. Plaintiff turned them out of the hog house and, with the help of members of his family, dragged the pigs out into the open air. These persons testified there was a strong odor in the house. They found breathing difficult and their eyes burned and watered. Fifty-six of the pigs never got up and were dead the next morning. Nine more were found dead several days later. The skin on the surviving pigs was badly burned, their eyes were "cloudy white" and they could not see. "They staggered and wobbled and couldn't find the feed or water." The sows would not breed and were worthless for breeding purposes.

Plaintiff promptly notified Meredith who said the man from whom they had gotten the spray would come out with him and see the hogs. Shortly thereafter plaintiff again talked with Meredith and was again told they would come out and plaintiff should do nothing with the hogs until they saw them and advised him. They never inspected the hogs. Meredith said he had been unable to contact the hog spray man. Later plaintiff asked Meredith what he should do with the pigs and was told to burn or bury the dead pigs, take the live ones to a sales barn and dispose of them. Plaintiff testified the pigs were worth $5 per head and the sows $30 or $40 per head after they were sprayed.

Dr. John Shoeman, a veterinarian, testified he examined the surviving pigs, June 23. Their skins were dry, thickened, cracked over their backs and shoulders and around their ears, some were blind, some with white corneas and swollen lids. They were gaunt and in poor condition. He made a post-mortem examination of two with the most skin lesions and found their livers were greatly enlarged and showed fatty degeneration which he diagnosed as due to chemical poisoning. The skin was three times normal thickness. He found enteritis in the pigs, but did not believe this caused their deaths. It was his opinion the impaired condition of the skin flared the enteritis. In his opinion some chemical put on the skin, which impaired its function, was the primary cause of death. He examined the spray and testified that type of fluid is generally used to paint chicken roosts to kill mites and for the preservation of wood, like creosote. It is a volatile material which becomes a gas when it reaches a certain temperature, apparently at the body temperature of a hog. In his opinion the pigs which died shortly after they were sprayed died of suffocation from material which volatilized at their body temperature when it came in contact with their bodies. The pigs breathing that gas had spasms of the glottis. Irritating material in the glottis causes it to close, there can be no intake of air and the animal suffocates. He testified also the spray would cause chemical burns of the kind found on the hogs he examined.

When the evidence for both sides was completed defendants moved for directed verdict (dismissal). Rule 216, Rules of Civil Procedure. The motion was overruled, the jury returned a verdict for plaintiff and judgment was rendered thereon. There

was no motion for new trial but defendants moved for judgment notwithstanding verdict, based upon the refusal to direct. Rule 243, Rules of Civil Procedure. This motion was overruled and defendants have appealed. They agree the appeal is limited to questions raised in their motion for directed verdict and repeated in their motion for judgment notwithstanding verdict. Friedman v. Colonial Oil Co., 236 Iowa 140, 145, 18 N.W.2d 196.

In considering appellants' contentions, the evidence, under the familiar rule, will be viewed in the light most favorable to plaintiff. The jury having returned a verdict for plaintiff, the function of this court, at this point, is not to weigh the evidence but to determine whether the verdict is supported by substantial evidence. On that account reference has been made herein to only part of the evidence for plaintiff and little of the evidence for defendants.

I. Appellants' main contention is the evidence the hogs were killed and injured by the spray is insufficient to support the verdict. They rely upon Tracy v. Liberty Oil Co., 208 Iowa 882, 226 N.W. 178, and Hildebrand & Son v. Black Hawk Oil Co., 205 Iowa 946, 219 N.W. 40. In Tracy it was claimed the death of sick hogs resulted, a few days later, from feeding them defendant's mineral preparation. However, there was no evidence to support this. Experts on both sides were unable to give an opinion as to the cause of death and spoke of several diseases as a probable cause. In Hildebrand there was no evidence connecting the use of the preparation with the death of or injury to the hogs, some days later.

The foregoing cases were referred to in Miller v. Economy Hog & Cattle Powder Co., 228 Iowa 626, 293 N.W. 4, which involved the death of sheep some days after they had been fed defendant's stock powder. There, evidence by veterinarians that ingredients of the stock powder would probably cause sickness and death of the sheep and that the deaths were not from disease was held sufficient to require submission to the jury of the question of proximate cause. Plaintiff cites other decisions of this court, none as strong as the case at bar, upon the question of causation. Here, there was evidence the hogs were in good health. Plaintiff applied the spray in accordance with the directions

given him by Meredith. Five minutes later he returned to the hog house and found almost all the pigs lying incapacitated on their sides and kicking and gasping for breath. The sows were restless and were immediately turned out. The pigs were dragged into the open air. The fumes then in the hog house made breathing difficult and caused the eyes of humans to burn and water. Fifty-six of the pigs were not again able to stand and died within a few hours. Others died within several days. A veterinarian who examined the spray testified it was a volatile material which in his opinion became a gas when it came in contact with the bodies of the hogs, and suffocated many of them. The remaining hogs suffered severe chemical burns on their skins, which blinded some of them, and, in the opinion of the veterinarian, who examined them and performed post-mortem examinations upon two pigs, were the primary cause of the death of the ones which did not survive. The surviving pigs were stunted and the sows were rendered useless for breeding purposes.

Appellants suggest food eaten by the hogs may have infected them. There is no evidence in the record directly pointing to any cause, other than the spray, for the injuries suffered by the hogs upon and after its application.

We are satisfied the evidence the spray killed and injured them was sufficient to require submission to the jury of that issue.

II. Appellants contend there was no proof the spray was warranted and of a breach thereof. The record does not definitely show whether the action is based upon express or implied warranty or both. Nor does it show how the court instructed the jury. The brief on each side states, in identical language, plaintiff brings this action "for damages claimed to have resulted from spraying his hogs with a spray * * * alleged to have been sold by defendants to plaintiff under a warranty that it was fit for use as a hog spray, * * *." As already noted, plaintiff testified Meredith told him they had some good hog spray and he guaranteed it, whereupon plaintiff bought it without knowing anything more about it.

One of the dictionary definitions of "good" is, "Adapted to the end desired or proposed; sufficient or satisfactory for its purpose." In McNabb v. Juergens, 180 N.W. 758, 761, not reported in Iowa Reports, this court said:

" '* * * The word "good" is very comprehensive in its meanings. As an adjective according to the context and with due regard to the connection in which, and the circumstances under which, it is used, the word may mean * * * reasonably sound and suitable; legally sufficient; unobjectionable.' "

Saunders v. Cowl, 201 Minn. 574, 577, 277 N.W. 12, 14, holds a statement a tent was in good condition was a warranty of quality, and states: "Where it appears that the word 'good' is used to designate the quality, kind, or condition of goods sold, it is an affirmation of fact or promise, as the case may be, and not the mere expression of opinion." The decision cites and discusses supporting authorities from various jurisdictions.

One dictionary definition of the word "guarantee" is "warrant", and guarantee is frequently used as the equivalent of warrant. Conkling v. Standard Oil Co., 138 Iowa 596, 600, 116 N.W. 822, 824; 44 Words and Phrases, Permanent Edition, Warranty, page 661.

Section 554.13, Code of Iowa, 1954, states: "Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon."

We conclude the evidence was sufficient to support a finding by the jury Meredith's language constituted an express warranty of the fitness of the mixture for spraying plaintiff's hogs. Miller v. Economy Hog & Cattle Powder Co., 228 Iowa 626, 634, 635, 293 N.W. 4, and citations; Rowe Mfg. Co. v. Curtis-Straub Co., 223 Iowa 858, 861, 273 N.W. 895, 897; Conkling v. Standard Oil Co., 138 Iowa 596, 600 to 604, 116 N.W. 822.

A proposition argued by appellants suggests the case may have been submitted to the jury upon the issue of implied warranty. Although not here in question, it may be observed subsection 6 of section 554.16, Code of Iowa, 1954, provides: "An express warranty or condition does not negative a warranty or

condition implied under this chapter unless inconsistent therewith." Many decisions upon that point are cited in Volume 35, Iowa Code Annotated, pages 169 to 171.

Subsection 1 of section 554.16, Code of Iowa, 1954, provides: "Where the buyer * * * makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

Subsection 4 of said section provides: "In the case of a contract to sell or a sale of a specified article under its patent or other trade name there is no implied warranty as to its fitness for any particular purpose."

▮ Appellants contend no warranty can here be implied because the spray was sold under its trade name. However, there was substantial evidence plaintiff did not purchase this spray by name, but for a particular purpose made known to appellants, and that he did not rely upon the trade name but upon appellants' judgment in furnishing him the spray for that purpose. Therefore, subsection 1, rather than subsection 4, would be applicable. Miller v. Economy Hog & Cattle Powder Co., 228 Iowa 626, 635, 293 N.W. 4, and citations; Drager v. Carlson Hybrid Corn Co., 244 Iowa 78, 82 to 85, 56 N.W.2d 18, 21, 22.

Hence, the record was sufficient to have supported a finding of implied warranty of the fitness of the spray for use on plaintiff's hogs. Whether such implied warranty would cover the same ground as the claimed express warranty and the effect thereof, if any, need not be considered. See Petersen v. Dreher, 196 Iowa 178, 194 N.W. 53; Wise v. Central Iowa Motors Co., 207 Iowa 939, 223 N.W. 862; annotations in Volume 35, Iowa Code Annotated, pages 169 to 171.

It may be observed that in Kitowski v. Thompson Yards, 150 Minn. 436, 438, 185 N.W. 504, 505, which involved a statement defendant's cement was "good" for use in constructing a certain building, the court stated it was not important whether it be called an express or implied warranty because the warranty shown was just what the Uniform Sales Act "declares an implied warranty."

■ Our conclusion, already noted, that there was substantial evidence the spray injured and killed the hogs, disposes of appellants' contention there was no evidence of a breach of warranty.

■ III. Another error assigned is the overruling of the ground of defendants' motion for directed verdict assailing the sufficiency of plaintiff's petition. We have already pointed to the narrow scope of this appeal, which is limited by the provisions of rule 243, Rules of Civil Procedure, for judgment notwithstanding verdict: (a) If the pleadings fail to aver some material facts necessary to constitute a complete cause of action "and the motion clearly specifies such failure or omission;". Defendants' motion asserted only that plaintiff's petition "fails to state a claim against the defendants upon which relief can be granted." This motion did not clearly specify such failure. Hence, it affords no basis for the assignment of error.

IV. Appellants contend there was no evidence of the value of the hogs before they were sprayed. This contention overlooks the testimony of plaintiff the hogs were well and in good condition, the pigs were worth $30 per head and the sows $160 per head.

V. It is contended the record shows the method adopted by plaintiff in spraying the hogs was negligent. There was substantial evidence he followed defendants' instructions.

Other propositions presented by appellants have been considered and found not to warrant a reversal.—Affirmed.

All JUSTICES concur.