**H. D. HALL, Appellant,**

**v.**

**J. D. HALL, Jr., et al., Appellees.**

**No. 3426.**

Court of Civil Appeals of Texas.

Waco.

Jan. 17, 1957.

Rehearing Denied Feb. 28, 1957.

L. L. James, Tyler, James & Mahanay, Cleburne, for appellant.

Grady, Johnson, Bell & Lee, Dallas, R. A. Kilpatrick, Cleburne, for appellees.

TIREY, Justice.

This action is one for breach of an oral contract and damages. At the conclusion of the evidence motion for instructed verdict was overruled and the jury in its verdict found substantially (1 and 2) that about October 13, 1953, H. D. Hall and J. D. Hall, Jr., mutually agreed that H. D. Hall should develop and sell Visador products in the northern territory for a reasonable time thereafter, and that three years was a reasonable time; (3, 4 and 5) that H. D. Hall's contract was terminated by J. D. Hall, Jr., as of September 1, 1955 without just cause, and that H. D. Hall was damaged thereby in the sum of $27,000; (6) that defendant is due appellant on commissions for sales made during the month of August 1955 the sum of $900 (there is no contest to this finding). (We think the testimony tendered is ample to sustain each of the findings of the jury.)

Appellant seasonably filed his motion for judgment on the verdict of the jury. Appellees seasonably filed their motion for judgment and for judgment notwithstanding the verdict in which they set out that under the provisions of Art. 3995, subsection 5, Vernon's Ann.Civ.St., they were entitled to a judgment as a matter of law, and further alleged that there was no evidence introduced tending to establish or support the jury's finding that appellant had been damaged in the sum of $27,000, and that such assessment of damages is contrary to the measure of damages as provided by law. (Appellees did not specifically ask the court in the last motion to disregard the jury's finding of $27,000, nor any other finding.) In the decree we find this recital: " * * * and the court being of the opinion and finding that the cause of

action asserted by plaintiff in this suit is founded upon an oral contract which, under the pleadings, evidence and verdict of the jury, is unenforceable under the terms and provisions of Art. 3995, subsection 5 of R.C.S. of Texas, and the Texas Statute of Frauds, and that plaintiff is not entitled to recover anything from defendants for the alleged executory breach of said contract, but the court finds that plaintiff should recover against defendants a judgment for $900.00 for commissions accruing on sales made prior to September 1, 1955, the date defendants terminated the contract sued on by plaintiff" and decreed accordingly.

Appellant assails the judgment on three points. They are substantially: (1) The court erred in refusing to render judgment in conformity with the verdict of the jury as required by Rule 300, Texas Rules of Civil Procedure; (2) the court erred in holding that the contract sued on is within the statute of frauds and is void; and (3) the court erred in holding (by implication) that the contract in question has not been taken out of the statute of frauds.

A statement is necessary.

Appellant went to trial on his first amended original petition and his first and second supplemental petitions. In his original petition we find this allegation:

That "on or about the 12th day of October, 1953, plaintiff and the defendants, acting through their duly authorized agent, J. D. Hall, Jr., who was at the time and still is acting as general manager of said partnership business, entered into a verbal contract in which it was agreed between plaintiff and defendants that plaintiff should be District Sales Manager for defendants in the development of the following territory, to-wit: North Dakota, South Dakota, Nebraska, Minnesota, Iowa, Wisconsin, Illinois, Michigan, Indiana, Ohio, Pennsylvania, Delaware, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire, Maine plus north tip of West Virginia, less metropolitan St. Louis and Athens, Ohio; and was by the terms of said contract to have complete control of all sales problems arising in connection with the development of said territory. It was further agreed in said contract that plaintiff was to pay all expenses incurred by him in the development of said territory and in the sales of defendant's merchandise throughout said 20 states.

"By the terms of said contract it was further agreed that for his services in developing said territory and selling defendants' merchandise therein, plaintiff was to receive from defendant, The Visador Company, a 12 per cent commission on all sales made in said territory, including all orders taken by plaintiff, as well as all orders sent or phoned in to the company by dealers in said territory."

In appellees' motion for judgment non obstante veredicto we find the following allegations:

"The allegations of plaintiff's pleadings in this cause establish, as a matter of law, that plaintiff's cause of action is based upon an oral contract under the terms of which plaintiff alleges that plaintiff was employed by defendant to perform personal services, that no time was fixed in the oral agreement as a period during which plaintiff and defendant agreed such services would be rendered, but such period of performance was affirmatively alleged to have been left indefinite by the parties plaintiff and defendants. That the alleged contract, as a matter of law, did not obligate the plaintiff to perform services for defendant for a specified period of time and the law reserved to plaintiff the right to quit defendants' service at any time without cause or notice to defendants. That the defendants, under said alleged contract, had the corresponding right to discharge plaintiff at any time without cause or

notice, such rights of plaintiff and defendants in this regard being mutual. That plaintiff affirmatively alleged that defendants had discharged the plaintiff on August 31, 1955. That, as a matter of law, defendants' act of discharging plaintiff was not a breach of the alleged oral contract and plaintiff's petition failing to state a cause of action against defendants, defendants are entitled to recover a judgment that plaintiff take nothing against them in this cause.

"That the evidence introduced upon trial of this case undisputably establishes that the parties plaintiff and defendants did not agree upon a fixed term of service by plaintiff but that the parties left said term indefinite. That the alleged oral contract under the proof and as a matter of law was terminable at the will of either party without notice and without cause and the act of defendants in discharging plaintiff was not a breach of the alleged contract. Under the evidence the defendants are entitled to a judgment that plaintiff take nothing against them by this suit."

Evidence was tendered to the effect that the Visador Company is a partnership owned by the Hall family, consisting of H. D. Hall, J. D. Hall, Jr., and other members of the Hall family, including sisters, nieces and nephews. The business was established in 1951 at Dallas, Texas, and is engaged in the manufacture and sale of ornamental door lights for front doors. From the beginning, J. D. Hall, Jr., has been general manager of the business, and H. D. Hall, the older of the two brothers, for two years prior to the contract sued on, was employed by appellees on a straight salary basis to develop what is denominated in the record as the "southern territory," which consisted of all of the United States, except what is denominated in the record as the "Northern territory," which consists of 20 contiguous states in the most northeasterly part of the United States.

After appellant had completed the development of the Southern territory, J. D. Hall, Jr., stated to appellant that he was ready to make a deal with him to develop the Northern territory on a commission basis, appellant to pay all expenses of the development of said territory, including salaries of any additional salesmen he might see fit to employ.

In the negotiations J. D. Hall, Jr., stated to appellant that it was very doubtful if appellees "would make much effort to work that area anyway as it is so far away." These negotiations extended over several weeks and on or about the 13th of October, 1953, the parties reached an oral agreement for appellant to develop the Northern territory.

Evidence was tendered to the effect that appellant designed all of the various designs of the lights manufactured by appellant. He also selected the name "Visador" and used it in a business of his own before the establishment of the Visador Company. Appellant also invented or improved the tool with which the lights are installed in doors and which is a very important factor and inducement in the sale of the prefabricated lights.

After the oral agreement was reached (October 1953) between the parties appellant went into the territory and began the work of developing the territory pursuant to the contract. On February 14, 1954 appellant wrote appellees a letter giving them a detailed report of the progress he was making in developing the territory. We quote the pertinent parts of the letter:

"I think it is time to take time out and kinda give you a report on the work as I see it up here. We are working the territory about as thoroughly as we can. This area is the only place where we find Maywood and Porter-Lite doing any business. I think we will get all the new business and 95% of the old and established business that is now going. The reason I think this is be-

cause our service calls for a lot more than just selling the lights. We have got to stay with the jobber until the lights are put in the door. That is the reason we will win and the reason they won't.

"I am able to make a demonstration where ever I call and that is a very good sign. We call on lots of jobbers that say they don't need any assistance in installing lights and I have always been able to show them our method is superior. I explain it is not better because we are smarter but because we have concentrated on it.

"The thing we are most concerned about right now is the fact that this program is not paying expenses and since Dad is going along with us and paying the deficit each month we want to know if you are satisfied with the program? It is as I had anticipated when we made the trade, not paying expenses, but we believe it is a winner and are willing to go along until the volume actually pays off. We know it takes volume and we believe the volume is here. We believe now is the time to get the volume. If you are satisfied, we are. If there is anything wrong with the plan as you see it, let's discuss it and get it straightened out.

"I called on Blount Lumber Company Friday A.M. and the thermometer stood at 10′ below zero. They were in the midst of a sales meeting and I was invited to sit at the conference table. We had a fine meeting and I went out to lunch with the group and then after lunch I worked in the shop about 40 minutes and got them all straightened out. I think their volume will double this coming year. We have some really big accounts that will start buying within next 30 or 60 days. They will represent the best firms up here. With the best firms buying it will be easy to get the little firms. My course is being directed in the main by the wishes of my prospects. Have requests to make two calls here in Syracuse from branches of associate firms.

"Of the last 35 days it has snowed on us 34 days. It is nothing to go out and take a towel and rake off 4 inches of snow before making a call. These folks up here amaze me, they pay no attention to the weather, just keep going right on."

J. D. Hall, Jr., under date of February 16, 1954, wrote appellant as follows:

"I got your letter this morning and was glad to know that you are not discouraged with the slow business in the North territory nor the weather. There is one thing for sure and that is when spring does open up they sure will get in a hurry up there.

"You need not be worried about what I think of our 'deal.' I am 100% happy with it because I think it is the best 'deal' either of us could possibly have. As I said before, it is very doubtful that we would make much effort to work that area anyway as it is so far away, but I think you can get $40,000.00 worth of business per month out of it in a couple of years. If you can we will both be ahead."

On June 16, 1954, appellees wrote appellant as follows:

"I am listing on the back of this letter a breakdown on deliveries made in your Northern territory during the month of May and am instructing the girls to do this each month hereafter. I am sure you will find it interesting and profitable to know just how your accounts are buying each month."

On June 17, 1955, appellees wrote appellant as follows:

"I have been following the sales figures for several months in the various territories as we break them down. May seems to be about an average of

the way it has been running. Your sales in the North East 20 states was $25,902.29. Our total sales was $86,051.93. In other words you sold about 30% of the total. When we consider the fact that the potential is probably twice as great in the territory you are trying to handle as it is in the rest of the country I can't help but feel that we are spinning our wheels. I have no criticism to offer about your personal work. I am sure you are doing all you can do, but what we must have is results. * * *

"My opinion is that the only way it can be kept is to have someone call on every account at least every six weeks. That is the way we are holding it in the other territories. I would like to have your thinking on this problem as soon as you have had time to give it some thought."

On July 25, 1955, appellees wrote appellant:

" * * * I am convinced that it is time to start making a change in our method of selling. * * * Certainly in the beginning it was necessary to show people how to use our product but now it is common knowledge all over the country and the necessity for these demonstrations should fade rapidly from now on.

"I think you should start immediately getting an organization together with a view toward covering your territory with salesmen. * * *

"As head of the territory it is up to you to select the men and to pay them out of your commissions, but you must understand also that since they will be representing Visador we must be in position to reject or dismiss any representative that we feel is not working to the best interests of the company."

On August 1, 1955, appellees wrote appellant as follows:

"You have been teaching the industry how to put prefabricated lights in doors for some four and a half years now. You have been selling a 'method.' As a result of this program we have sold lots of units * * *

"I am not dissatisfied with what you have done. You have done an excellent job, and one that I really doubt could have been done as quickly and as well by anyone else anywhere. But, it is now time to drop that program and start selling Visadors. We must sell them like Firestone sells Firestone products. * * * If you can be enthusiastically sold on the program you can be a lot of help to us and we want you to stay with us and continue to handle the northern territory as long as you are able to get the job done. But, if you still think we are 'nuts' after giving this careful consideration, I would appreciate it if you would send in your resignation, because we have definitely decided to drop the old program not later than September 1st and start on the new one.

"Let me hear from you as soon as you make up your mind."

In June 1955 appellees (for the first time) suggested that he give some thought to employing more men for this territory and in this letter stated that appellant was "spinning his wheels" notwithstanding the fact that for the previous month he had sold in this Northern territory, 19 months from the time he started, $25,902.29, while, for the same month, appellees in all the rest of the United States, with 15 salesmen, sold only $86,051.93, appellant having sold 30% of the total. Needless to say, appellant's ground work was now paying off.

In August 1955, about one month before appellees terminated the contract, J. D. Hall, Jr., wrote appellant substantially as follows: "I am not dissatisfied with what you have done. You have done an excellent job and one that I really doubt.

could have been done as quickly and as well by anyone else anywhere;" however, in this letter appellees demanded that appellant hire more men "or send in your resignation."

On August 25, 1955, appellant wrote appellee as follows:

"For the sake of harmony and peace among so many members of our family we are now ready to dismiss our plan and get behind yours 100%. We are in the market for men to do this work. A lot of development has yet to be done in Michigan and Northern Indiana and we think it best we handle the work in these two states ourselves for some time to come."

On August 29, 1955, J. D. Hall, Jr., wrote appellant as follows:

"You are now offering to do so because I forced you. This is not the kind of service on which a business can be built. No, I have definitely concluded that we cannot work together in peace and harmony and am now taking steps to place men in the North on what I think is the proper basis."

Evidence was tendered that what appellees meant by proper basis was on a 5% commission instead of 12%. Evidence was also tendered to the effect that appellant had expended $17,131.67 in developing the Northern territory and had made for appellees a net profit of approximately $63,-737 (partially estimated). Evidence was also tendered to the effect that appellees were out in the development on this territory the expense of two collect telephone calls which appellant placed to the home office, and with regard to which appellees wrote appellant as follows: "I notice you have made a couple of calls 'collect' since you have been out on this trip. None of our other representatives have this privilege so you mustn't do it either."

We think it pertinent to say here that defendants went to trial on their first amended original answer, their first supplemental answer and their second supplemental answer and cross action. As we understand the foregoing pleadings of appellees, they did not specifically plead the provisions of the memorandum agreement (not signed) as a defense to appellant's cause of action, but if we be mistaken in this behalf they made no request to the court except to give an instructed verdict and made no exceptions to the court's charge to the effect that the court had failed to submit their defenses or the relief they asked for in their cross action. We find no request for special issues. In their motion for instructed verdict the prayer is: "Wherefore, defendants move the court to instruct a verdict in this case for the defendants." It is true that in appellees' motion for judgment non obstante veredicto they did aver in effect that there was no evidence to sustain any of the findings of the jury, but as we understand this motion it did not specifically ask that each or any of the findings of the jury be disregarded by the court. (Since we are of the view that the testimony was ample to sustain each of the findings, appellees' failure to ask the court specifically to disregard each of the findings passes out of the case). Their prayer was: "Wherefore, defendants pray judgment of this motion that plaintiff take nothing against them and that they go hence with their costs without day." It follows that any defensive matter relied upon by appellees is waived except such as they may be entitled to by virtue of their motion for instructed verdict. Of course, if the motion for instructed verdict should have been granted, then the motion for judgment non obstante veredicto should have been sustained. See Rule 279, T.R.C.P. and Wichita Falls & Okla. Ry. Co. v. Pepper, 134 Tex. 360, 135 S.W.2d 79. See also Rules 300 and 301, T.R.C.P.

Going back to appellant's Point 2, we are of the view that under the pleadings and testimony and under admissions made by appellees in their motion for judgment

non obstante veredicto above quoted, the oral contract sued upon does not come within the provisions of Art. 3995, subsection 5, aforesaid.

Much has been written on the foregoing subsection. Our Supreme Court in 1948 in Chevalier v. Lanes, Inc., 147 Tex. 106, 213 S.W.2d 530, 532, 6 A.L.R.2d 1045, reviewed ·the history of the above statute and many of the leading cases that had theretofore been written on this matter by our appellate courts, ·and announced this rule:

"* * * that where, by the terms of the oral agreement, its period is to extend beyond a year from the date of its making, the mere possibility of its termination by operation of law within the year, because of death or other fortuitous event, does not render paragraph 5 of the Statute inapplicable, but that, on the other hand, where the agreement may, by its own terms, be fully performed within the year, as, for example, the agreement in Wright v. Donaubauer, 137 Tex. 473, 154 S.W.2d 637, for employment during the term of a man's life, the Statute does not apply. By the foregoing we necessarily approve the above mentioned line of authority represented by Paschall v. Anderson, supra [127 Tex. 251, 91 S.W.2d 1050], and overrule the line represented by Weatherford, Mineral Wells & Northwestern Railway Company v. Wood, supra [88 Tex. 191, 30 S.W. 859, 28 L.R.A. 526], and Great Atlantic & Pacific Tea Co. v. Warren, supra [Tex. Civ.App., 44 S.W.2d 510]. We also take occasion here to reaffirm our holding in Wright v. Donaubauer, supra, though it was not immediately involved in the conflicts above discussed."

Our Supreme Court in Wright v. Donaubauer, 154 S.W.2d 637, 639, made this statement of the rule: "To condemn a contract as violating the Statute of Frauds, it must appear from the agreement itself that it is not to be performed within a year after its execution," citing a long list of cases.

It is our view that under all of the facts and surrounding circumstances, many of which have been heretofore detailed, that the oral contract relied upon by appellant did not violate the terms of the statute under consideration and the court's holding that it did is erroneous. But if we be mistaken in this behalf, we think the appellees and appellant took the oral contract out of the statute by virtue of the correspondence between them. In plaintiff's first supplemental petition he specifically denied that the contract sued upon was void, and further specifically plead "that if said verbal contract, as alleged in plaintiff's petition, was ever within the statute of frauds, as alleged by defendants, that said contract has been removed from the condemnation of the statute of frauds and confirmed by various and sundry memorandum in writing as will be hereinafter set forth." Appellant then specifically plead the letter he wrote on the 14th of February 1954 to J. D. Hall, Jr., which has been previously set out in the opinion, and specifically plead J. D. Hall, Jr.'s reply of February 16, 1954, which has been previously set out, and in this letter of February 16th we find this statement and admission by J. D. Hall: "You need not be worried about what I think of our 'deal.' I am 100% happy with it because I think it is the best 'deal' either of us could possibly have. As I said before, it is very doubtful that we would make much effort to work that area anyway as it is so far away, but I think you can get $40,000.00 worth of business per month out of it in a couple of years. If you can we will both be ahead."

Evidence was tendered to the effect that appellant went ·to work on October 15, 1953 in the territory under consideration and from that date until the 31st of October 1953, his total sales amounted to $4,129.-07; November 1953, $10,629.23; Decem-

ber 1953, $5,004.30; January 1954, $2,578.-35; February 1954, $6,726.05; March 1954, $7,584.63; April 1954, $7,713.59; May 1954, $6,974.31; June 1954, $12,880.76; July 1954, $12,138.89; August 1954, $12,680.90; September 1954, $19,161.56; October 1954, $24,-615.37; November 1954, $17,105.19; December 1954, $15,800.89; January 1955, $13,073.16; February 1955, $13,303.24; March 1955, $18,209.74; April 1955, $15,-173.78; May 1955, $25,902.29; June 1955, $24,339.62; July 1955, $23,680.76; August 1955, $19,281.81. Appellant had expended of his own money a little in excess of $17,-000 in developing the business and his lowest commission was $309.40 for January 1954. His highest commission was in May 1955 for the sum of $3,108.07. His commission on June 1955 business was $2,920.75, and for July 1955, $2,841.69, and for August 1955, $2,313.82.

In Gray v. Devers Mercantile Co., Tex. Civ.App., 245 S.W. 953, 954 (no writ history) we find this statement of the rule:

" * * * In order to satisfy the statute of frauds, the writing relied on must be a memorandum of the actual contract as made orally. It must embrace the terms of the oral contract sought to be enforced, or, by its own terms, be broad enough to admit evidence of all the terms of the oral contract. That is to say, the memorandum must be the evidence of the oral contract, as actually made, and only such oral evidence can be received as will explain the terms and references contained in the memorandum. It must not add new conditions, nor relieve the oral contract of any of the conditions actually made. If it is not a memorandum of the actual contract made, but is a new contract, then it does not relieve the original contract of the bar of the statute. 27 C.J. 265, § 314. On this proposition, Judge Woolley said, in Kleman v. Anheuser-Busch Brewing Ass'n, 3 Cir., 237 F. 993, 150 C.C.A. 643:

" 'It is elementary that the writing must be a memorandum of the contract, for if it states something different from the contract, it manifestly is not a memorandum of the contract, but is a memorandum of something else, and the statute is not satisfied. This principle is amply supported by the authorities, and perhaps is no better stated than by Wood in his work on Frauds, section 345, as follows:

" ' "In order to make a writing of this character sufficient, it must admit the substance of a previously completed contract between the parties. It cannot be used to make, but only to prove a contract already made; and although it admits the contract, if it annexes conditions to it or otherwise varies it, it has no effect as a memorandum." ' "

See also cases collated under 18 Tex.Dig., Frauds, ▇▇▇▇

It is our view that the correspondence tendered satisfies the foregoing statement of the rule. It was undisputed as to the territory the parties agreed to and where appellant was to work. He was to have a free hand in the development of this territory and he was to do it at his own expense for a commission of 12% of his sales. For example, on January 26, 1954, appellees wrote appellant as follows:

"Dear H. D.:
"The only thing I have given Bob is the outline of your territory verbally and the information that the development of this territory is your responsibility and that any salesman hired for that territory would be by you and would work for you. I pointed that whatever agreement was made would be between you and him. He understands this, so the way is open for whatever plan you think best for the interest of the company and yourself."

We have previously quoted the letter of February 16, 1954, written by J. D. Hall, Jr., to appellant. We have likewise previously quoted appellees' letters of June 16, 1954, June 17, 1955, July 25, 1955 and August 1, 1955.

When the correspondence tendered in this cause, which we have set out, is carefully considered, we think it conclusively shows that the minds of the parties met as to the terms of the oral contract previously agreed to and that appellees were, as they said, 100% satisfied with the way that appellant was performing his contract. It is true that subsequent correspondence shows that appellees became dissatisfied and wanted to impose new conditions and assert their own ideas as to how the territory should be developed, but these new ideas of development and changes in the management on the part of appellees were after appellant had gotten his volume of business up to around $25,000 plus per month and his commissions were running in the neighborhood of two to three thousand dollars per month. (In short, appellant had gotten his sales program off of the ground.)

Because of the views heretofore expressed, we do not think the trial court had the right to grant in part appellees' motion for judgment non obstante veredicto, and that his action in so doing, wherein he failed to enter judgment on the verdict of the jury for the additional sum of $27,000 awarded to appellant, must be reversed and rendered and judgment rendered thereon in favor of appellant against appellees for such sums.

Accordingly, the judgment of the trial court, wherein it refused to enter judgment for $27,000 awarded to appellant is reversed and judgment is here rendered that appellant recover such additional sum against appellees. That part of the judgment heretofore awarding $900 in behalf of appellant against appellees is in all things affirmed, and all costs are here taxed against appellees.

Affirmed in part, reversed and rendered in part.