**O. M. FRANKLIN SERUM COMPANY, Appellant,**

v.

**C. A. HOOVER & SON et al., Appellees.**

**No. 7883.**

Court of Civil Appeals of Texas.

Amarillo.

Jan. 13, 1969.

Rehearing Denied Feb. 10, 1969.

See also Tex., 418 S.W.2d 482.

Underwood, Wilson, Sutton, Heare & Berry, R. A. Wilson, Amarillo, of counsel, for appellant.

Lemon, Close & Atkinson, Otis C. Shearer, Perryton, of counsel, for appellees.

DENTON, Chief Justice.

Our former opinion is withdrawn and the following opinion is submitted in lieu thereof.

This is a products liability case. C. A. Hoover and Dale Hoover, a partnership, d/b/a C. A. Hoover & Son, brought this suit against O. M. Franklin Serum Company, alleging the death and injury to calves as a result of the use of an antibiotic consisting of penicillin and dihydrostreptomycin sold under the trade name of "Franklin Pen-Strep". Based on a jury verdict the trial court entered judgment for the plaintiffs.

On October 14, 1964, Dale Hoover injected 28 of their registered Hereford calves with a serum. 25 were injected with Pen-Strep, a serum distributed by the defendant, while the other three were injected with another serum obtained from a local veterinarian, called neomycin. Mr. Hoover testified it took some approximately 30 minutes to complete the inoculation of all the calves. By the time the last calves had been injected, five of the calves which had been injected with Pen-Strep "were already dead, and the other calves were reacting". A total of nine calves died within a few minutes after the injections were completed. Another calf died about two weeks later and the eleventh calf died some two months later. The remaining fourteen were adversely affected and recovered slowly. The three calves which were injected with neomycin obtained from the veterinarian were not affected. Plaintiffs alleged the serum distributed by Franklin was not fit for its intended use and this unfitness was the producing cause of the death of the eleven calves and injuries to the remaining fourteen. No acts of negligence were alleged. Recovery is sought only on the theory of breach of warranty. This cause was previously before the court on plea of privilege. O. M. Franklin Serum Company v. C. A. Hoover & Son (Tex.Civ.App.), 410 S.W.2d 272 (Error Ref.N.R.E.). With Per Curiam opinion, 418 S.W.2d 482. The prior decision extended the doctrine of strict liability of sellers of defective products which cause physical harm to persons, as held in McKisson v. Sales Affiliates, Inc (Sup.Crt.), 416 S.W.2d 787 to defective products which cause damage to property of the ultimate consumer.

The jury found that the serum distributed by Franklin was unfit for its intended use; that the use of the serum was the producing cause of the death and harm suffered by the calves; and that harm to the cattle was not the result of an abreaction. The defendant contends first there is no evidence and insufficient evidence of the unfitness of the serum for its intended use; and there is no evidence and insufficient evidence that any harm to the calves was not the result of an abreaction.

The Hoovers were ranchers in the Perryton, Texas area. They normally raise from 225–260 Hereford calves each year.

These calves would always be injected for blackleg and malignant edema. It was also their common practice, at weaning time or times of stress, to give the calves an injection of Pen-Strep as treatment for an oncoming respiratory ailment. Dale Hoover, a holder of a Bachelor's and Master's degree in Animal Husbandry, performed the injections here in question. Appellees had trucked these 28 calves to their home ranch from a distant ranch after they had been weaned shortly before. On the morning in question, Dale Hoover noticed three of the calves showed signs of respiratory disorder, primarily some discharge from the nose. He informed Dr. Hardy, a local veterinarian, of this condition, who prescribed an injection of neomycin for these three. Upon Hoover's further inquiry, Dr. Hardy agreed it "would do no harm" to inject the remaining 25 calves with Franklin's Pen-Strep "at the same time". Hoover obtained the serum for the three calves from the veterinarian and purchased two bottles containing 200 ccs. each of Pen-Strep from a Perryton drugstore on the morning of October 14. He began the 30 minute operation shortly after purchasing the serum. Immediately upon completion of the injections, the reaction of the calves was noticed by Hoover, as previously stated. By the time Hoover followed the last calf into the lot, five calves were already dead and the other 20 calves were reacting. Some of the calves were laying down in apparent pain, some were having muscle convulsions, some frothing or salivation at the mouth, and some showed signs of swelling around their eyes and nose. Some of the calves that were not down "showed excessive salivation and were doing lots of groaning and carrying on, making it readily visible they were in pain". Hoover called Dr. Hardy at once, who came within ten minutes and began treating the calves. Four more of the calves died shortly after Dr. Hardy arrived. Dr. Hardy described the calves as "the sickest bunch of cattle I have seen". Two of the remaining fourteen which did not die but were adversely affected did not respond to care and feed and were sold later by the pound as grade cattle. The remaining twelve were sold the following spring as breeding bulls. Dr. Hardy performed an autopsy on one of the bulls and found "the lungs were quite edematous, containing large amounts of fluid, also fluid around the trachea, which is the windpipe * * * also emphysema of the lungs. This is actually there in the lungs, but in the part of the lungs in the tissue where it is not supposed to be. This is brought about by labored respiration, fast respiration." Dr. Hardy, from the history he was able to obtain and upon what he saw, made a tentative diagnosis of anaphylactic shock. No other diagnosis was offered. Dr. Hardy explained he could have no final diagnosis unless he had something pathognomonic, which he has defined as "clear cut" or "that it has got to be this, nothing else" or "I have a laboratory report confirming this tentative diagnosis". In describing anaphylactic shock, Dr. Hardy testified: "I believe the classical definition of anaphylactic shock would be something like a hypersensitivity resulting from previous exposure to a foreign protein, usually by injection". All veterinarians testifying agreed anaphylactic shock could also be caused by contact with a fungus through the skin, through injection, or eating, usually some plant that might synthetize animals. However, Dr. Hardy testified anaphylactic shock "is not a well understood thing". An examination of the defendant's expert witnesses seemed to confirm this conclusion.

As stated, the rule of strict liability of sellers of defective products which cause damage to the property of the ultimate consumer by virtue of an implied warranty of fitness has been pleaded and is applicable in the instant case. This is the law of this case; O. M. Franklin Serum Company v. C. A. Hoover & Son (Sup.Crt.), 418 S. W.2d 482. The primary question on this appeal on the merits is causation, that is, whether the Pen-Strep distributed by Franklin caused the damage to the Hoover calves as a result of its being unfit for its intended use.

There is no direct evidence the serum used in inoculating the 25 Hoover calves was defective. However, any element, including a proximate cause may be established by circumstantial as well as by direct evidence. Bock v. Fellman Dry Goods Company (Tex.Comm.App.), 212 S. W. 635 (Opinion adopted). Republic National Life Insurance Company v. Bullard (Tex.Civ.App.), 399 S.W.2d 376 (Ref. n. r.e.). This rule does not require the quality of absolute certainty, nor is the plaintiff required to exclude every other possibility. It is required that the circumstances point to the ultimate fact sought to be proved with that degree of certainty as to make the conclusion reasonably probable. McMillen Feeds, Inc. of Texas v. Harlow (Tex.Civ.App.), 405 S.W.2d 123 (Ref. n.r.e.).

In addition to the neomycin purchased from Dr. Hardy, and which was used to inject the three calves which were not affected, Hoover purchased two bottles of Pen-Strep, each containing 200 ccs. The supply in the first bottle was all used and the last "one or two" of the 25 calves were inoculated from the second bottle. Hoover used the same syringe throughout the operation, and through an experiment conducted by Dr. Hardy during the trial, it was shown there would have been a "carry-over" of the serum from the first bottle in the syringe which could have contaminated the serum removed from the second bottle. It is undisputed all 25 calves injected with Pen-Strep were affected almost immediately after the injections. Five died within minutes and four others died within an hour. The remainder were affected to a lesser degree within minutes. Dr. Hardy testified the 100% reaction "would be indicative to me, would indicate, that maybe something was wrong with this product, but still not conclusive". Dr. Morgan, a veterinarian employed by Franklin also confirmed that the 100% reaction indicated "there was a contaminant in the product" if that was the only information that he had other than the diagnosis of anaphylactic shock. Dr. Morgan testified shock was

becoming evident in the use of pharmaceutical and biologics in the veterinary field, and his company saw the need for a treatment of shock in 1960 to be administered by ranchers and stockmen. The company proposed a product for this treatment which contained epinephrine, but the government refused to permit the product to be marketed because epinephrine is a hormone-like product and the law required a prescription for its purchase. Franklin recognized the frequency of shock in these cases and had prescribed a method of treatment for anaphylactic shock in its catalogue since 1961. The catalogue, in evidence, stated anaphylactic shock "is a situation of individual animals and not necessarily a herd problem". The article then prescribes the prompt use of adrenalin (epinephrine) as a treatment for anaphylactic shock. The distribution of the circular is not shown and there is no evidence Hoover had read or had knowledge of this information contained in the catalogue. No such warning appeared on the labels of the bottles containing Pen-Strep. On the numerous previous occasions Hoover had used Pen-Strep, his cattle had never suffered anaphylactic shock before. Hoover's expert witness testified that the most extensive reaction a herd had experienced from the use of Pen-Strep or other serum containing penicillin and dihydrostreptomycin that he had previously known of was approximately eight cattle out of a herd of 96. The highest percentage of reaction observed by Dr. Morgan, a witness for the defendant, was approximately 3%.

As previously stated, one of the two bottles purchased by Dale Hoover was used up entirely. Only one or two calves were injected with the serum from the second bottle. A sample from this second bottle was taken by a representative of Franklin, from which two tests were made. A sterility test revealed the product was free of any contaminating bacteria or fungi. A safety test, performed by injecting the product into another animal, showed no adverse reaction to that product. Obviously, no sample was available from the first bot-

tle. An antibiotic certificate issued by the Food and Drug Administration shows the "batch mark", out of which came the serum used by Hoover, was a product which was not toxic, was correctly made and could be safely used in the inoculation of cattle.

█ The thrust of Franklin's position is it was entitled to an instructed verdict for the reason there was no evidence of the serum being used being defective; that it had fully complied with and met the governmental requirements as to sterility, purity, and safety. In support of its position, appellant cites and relies principally on Cudmore v. Richardson-Merrell, Inc. (Tex.Civ.App.), 398 S.W.2d 640 (Ref. N. R.E.); and Howard v. Avon Products, Inc., 155 Colo. 444, 395 P.2d 1007. The *Cudmore* case involves physical injury to a person as a result of using a drug manufactured by the defendant. While taking the drug, plaintiff observed loss of hair and flaking of skin. After taking the drug for approximately one year the plaintiff was diagnosed as having cataracts in both eyes. The jury found the plaintiff's cataracts were the result of abreaction or sensitivity to the drug; and that the plaintiff belonged to a class of people, not appreciable in number, who are allergic to the drug. In affirming the lower court's judgment denying plaintiff recovery, the court held the manufacturer of the drug intended for human consumption or intimate bodily use should be held liable on the ground of breach of implied warranty only when such results or some similar results ought reasonably to have been foreseen by a person of ordinary care in an appreciable number of cases.

We agree both with the court's holding in that case and the inference that the holding would also apply in cases of the manufacturer of drugs for the use of animals. However we do not consider the case controlling under the facts and circumstances present here. There, the jury found the drug was not a proximate cause of plaintiff's cataracts; that the cataracts were the result of abreaction; and that the plaintiff belonged to a class of people, not appreciable in number, who are allergic to the drug. The Howard v. Avon Products Company case also denied plaintiff's recovery for injuries suffered from a reaction from a cosmetic product on the ground that the plaintiff failed to bring herself within the identifiable class and sufficient number concept. These cases involved the problem of the allergic or unusually susceptible single consumer to the product. Except for the diagnosis of anaphylactic shock, there is no evidence the 25 Hoover calves were allergic to the ingredients found in Pen-Strep; or that they had been exposed to anything that would tend to render them sensitive to the serum. These calves had had no previous injections of a penicillin product or any other product that would have made them sensitive to the ingredients found in Pen-Strep.

█ There are quite a number of cases from other jurisdictions where governmental regulations and requirements have been satisfactorily met in connection with the production of a product, and the courts held that it was a jury question when the circumstances established that sickness and death immediately follow the use of the product. Brown v. Globe Laboratories, Inc., 165 Neb. 138, 84 N.W.2d 151; American Cyanamid Company v. Fields (4th Cir.), 204 F.2d 151; Chandler v. Anchor Serum Company, 198 Kan. 571, 426 P.2d 82; Haberer v. Moorman Manufacturing Company, 341 Ill.App. 521, 94 N.E.2d 611; Marxen v. Meredith, 246 Iowa 1173, 69 N. W.2d 399; Economy Hog & Cattle Powder Company v. Compton, 192 Ind. 222, 135 N. E. 1; Miller v. Economy Hog & Cattle Powder Company, 228 Iowa 626, 293 N.W. 4. See also 81 A.L.R.2d, pp. 190. We think the reasoning and ruling in these cases are applicable to the facts and circumstances presented here.

█ From a review of the facts and circumstances relating thereto, together with the inferences that may be legitimately drawn therefrom, we think the evidence

presented a jury question as to whether or not the impled warranty of fitness was breached and if so, whether or not the breach was the cause of the death or sickness of appellees' calves. As stated in Reid v. Ehr, 43 N.D. 109, 174 N.W. 71: "The physical facts speak louder than the testimony of the experts." The 25 calves injected with Pen-Strep were severely injured. Every calf reacted violently almost immediately after each was injected. A 100% reaction is undisputed. The three calves injected during the same operation with neomycin had no adverse affects. The 25 were in good health prior to the administration of the Pen-Strep. It was given simply as a precaution or treatment for a possible respiratory infection. We think the evidence supports the jury findings that the serum was unfit for its intended use; and that the harm to the calves was not the result of an abreaction. We overrule appellant's first four points of error.

■ Appellant contends the trial court erred in overruling its motion for judgment non obstante veredicto founded on the assumed risk principle. There were no pleadings to support this affirmative defense. No special issues involving this defense were requested and none were submitted. In the absence of such pleadings and findings, this defense was waived. Hall v. Hall (Tex.Civ.App.), 298 S.W.2d 950. Reversed on other grounds 158 Tex. 95, 308 S.W.2d 12. Rule 277, Texas Rules of Civil Procedure.

■ In its instructions to the jury, the trial court defined "unfit for its intended use" as follows: "* * * means a product sold in a defective condition, unreasonably dangerous to the user or consumer or to its property; that is to say, dangerous to an extent beyond that which would be contemplated by the ordinary user with the knowledge available to him as to the characteristics of the product." It is appellant's contention the definition is inadequate and too burdensome upon it in that it

ignores the need to weigh the utility of the product against the possibility of harm. Appellant's requested instruction correctly incorporates the omission here complained of. We are of the opinion the instruction given was proper. The first clause of the instruction uses the exact language found in Section 402A(1) of the American Law Institute's Restatement of the Law of Torts (2d ed.). The second clause is substantially identical to the language in Comment (i) under Section 402A. The instruction given would not place an undue burden on the defendant and is in substantial compliance with the strict liability concept adopted by the courts of this state.

■ Appellant next asserts error in the trial court's circumstantial evidence instruction. Their position is the instruction did not distinguish between reasonable deduction and pure speculation. The proof offered was both direct and circumstantial. It was thus proper to charge upon circumstantial evidence. The court's instruction reads: "You are instructed that a fact may be established by circumstantial evidence. A fact is so established when the existence of such fact is fairly and reasonably inferred from the other facts proven in the case." This instruction is substantially and in essence the same as that approved by our Supreme Court in Larson v. Ellison, 147 Tex. 465, 217 S.W.2d 420. Appellant's point of error is not well taken.

■ Appellant next contends the Court erred in overruling their objection to the court's charge founded on the inquiry of "producing cause" as distinguished from "proximate cause". The court defined producing cause as "an efficient, existing or contributing cause, which, in a natural and continuing sequence, produces the injury or damages complained of, if any." The crux of appellant's objection is the absence in the definition given of the element of foreseeability. This precise question was before the court in Cudmore v. Richardson-Merrell, Inc. (Tex.Civ.App.), 398 S.W.2d 640 (Ref. N.R.E.). The plaintiff contend-

ed he had sustained cataracts from taking a drug manufactured by the defendant. The causation issue inquiring if the drug was the proximate cause of the injury was answered in favor of the defendant. On appeal the plaintiff contended the submission of the proximate cause issue, including the element of foreseeability, was error, and that producing cause, without the element of foreseeability, would have been the proper submission. The court rejected this contention and held "we think that foreseeability is properly an element in the law of implied warranty in products liability cases such as the one we have before us on this appeal."

There can be no recovery against a drug manufacturer or other seller of drugs and medicine for injury following the use of such product in the absence of proof of proximate causation. 79 A.L.R.2d Products Liability—Drug and Medicine, Section 21, pp. 338. Foreseeability is an element of the definition of proximate cause. Rudes v. Gottschalk, 159 Tex. 552, 324 S.W.2d 201. We are of the opinion the trial court erred in predicating the causation issue on producing cause rather than on proximate cause.

Appellant also contends there was error in that the special issue was so framed as to inquire of the fitness of the product at the time it was used by Dale Hoover rather than when the product left Franklin's control. The issue complained of inquired if the "serum used by Dale Hoover *on the occasion in question* was unfit for its intended use of injection into cattle?" (Emphasis added). We do not so interpret this issue. The phrase "on the occasion in question" simply identifies the serum. It could not have misled the jury. We agree that appellant's liability must be determined as of the time the product left its control, but we do not think the wording of the special issue does violence to this rule of law. The Pen-Strep used by Hoover came in a sealed container. It is thus inferrable that the product reached the consumer without substantial change in the condition with which it was sold. McKisson v. Sales Affiliates, Inc., supra. Appellant's last point of error presents no reversible error.

The judgment of the trial court is reversed and the cause is remanded.

JOY, J., not participating.